**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE UNITED STATES OF AMERICA,

*Plaintiff*,

v.

DISTRICT OF COLUMBIA BOARD OF ELECTIONS; MONICA H. EVANS, in her official capacity as Executive Director for the District of Columbia Board of Elections; GARY THOMPSON, in his official capacity for the District of Columbia Board of Elections as Chair and Member; and KARYN GREENFIELD, in her official capacity for the District of Columbia Board of Elections as Member,

*Defendants*.

Civil Action No. 25-4403 (RDM)

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION OF COMMON CAUSE, RUTH GOLDMAN, AND CHRIS MELODY FIELDS TO INTERVENE AS DEFENDANTS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

ARGUMENT ..... 1

I. Common Cause Intervenors Are Not Required to Demonstrate Standing. ..... 2

A. Supreme Court Precedent Confirms Intervenors Need Standing Only if They Seek Unique Relief. ..... 2

B. Any Contrary Circuit Precedent Is Displaced by Binding Supreme Court Authority. ..... 6

II. Proposed Intervenor-Defendants Independently Satisfy Article III Standing ..... 8

A. The Individual Intervenors Have Standing. ..... 8

B. Common Cause Has Standing. ..... 12

CONCLUSION ..... 13

CERTIFICATE OF SERVICE ..... 15

**TABLE OF AUTHORITIES**

**Cases**

*Alliance for Retired Americans v. Bessent*,
770 F. Supp. 3d 79 (D.D.C. 2025) ........ 9, 10

*Amgen Inc. v. Kennedy*,
No. 24-cv-3571, 2026 WL 202157 (D.D.C. Jan. 27, 2026)........ 7

*ASARCO Inc. v. Kadish*,
490 U.S. 605 (1989)........ 2

*Babbitt v. United Farm Workers National Union*,
442 U.S. 289 (1979)........ 2

*Bahlul v. United States*,
77 F.4th 918 (D.C. Cir. 2023)........ 6

*Biden v. Nebraska*,
600 U.S. 477 (2023)........ 3

*Center for Sustainable Economy v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015) ........ 12

*Children's Health Defense v. Centers for Disease Control and Prevention*,
No. 23-cv-431, 2024 WL 3521593 (D.D.C. July 24, 2024) ........ 7

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)........ 3

*Clinton v. Jones*,
520 U.S. 681 (1997)........ 5

*Crossroads Grassroots Policy Strategies v. Federal Election Commission*,
788 F.3d 312 (D.C. Cir. 2015) ........ 9

*DaimlerChrysler v. Cuno*,
547 U.S. 332 (2006)........ 5

*Diamond v. Charles*,
476 U.S. 54 (1986)........ 3

*Environmental Integrity Project v. Wheeler*,
No. 20-cv-1734, 2021 WL 6844257 (D.D.C. Jan. 27, 2021)........ 6, 7

*Exxon Mobil Corp. v. Allapattah Services, Inc.*,
545 U.S. 546 (2005)........ 4

*Flast v. Cohen*,
392 U.S. 83 (1968) ... 3

*Hannam Chain USA, Inc. v. National Labor Relations Board*,
No. 25-cv-2896, 2025 WL 4083334 (D.D.C. Sept. 27, 2025) ... 7

*Holmes v. Elephant Insurance Co.*,
156 F.4th 413 (4th Cir. 2025) ... 11

*In re Crawford*,
194 F.3d 954 (9th Cir. 1999) ... 10

*Institutional Shareholder Services v. Securities & Exchange Commission*,
142 F.4th 757 (D.C. Cir. 2025) ... 7, 8

*League of United Latin American Citizens v. Executive Office of the President*,
No. 25-cv-956, 2025 WL 3042704 (D.D.C. Oct. 31, 2025) ... 12

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ... 12

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) ... 2, 4, 5, 6, 7

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ... 9

*Moore v. Kobach*,
359 F. Supp. 3d 1029 (D. Kan. 2019) ... 10

*Old Dominion Electric Cooperative v. Federal Energy Regulatory Commission*,
892 F.3d 1223 (D.C. Cir. 2018) ... 6

*Public Interest Legal Foundation, Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ... 10

*Randolph v. ING Life Insurance & Annuity Co.*,
973 A.2d 702 (D.C. 2009) ... 11

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
547 U.S. 47 (2006) ... 3

*Shady Grove Orthopedic Associates, Pennsylvania v. Allstate Insurance Co.*,
559 U.S. 393 (2010) ... 3

*Spector Motor Service v. McLaughlin*,
323 U.S. 101 (1944) ... 5

*Spokeo v. Robins*,
578 U.S. 330 (2016) .......... 9, 11

*Town of Chester, New York v. Laroe Estates, Inc.*,
581 U.S. 433 (2017) .......... 4

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 2, 3, 8, 9

*United Mine Workers v. Gibbs*,
383 U.S. 715 (1966) .......... 4

*United States v. Denedo*,
556 U.S. 904 (2009) .......... 4

*United States v. Oregon*,
No. 6:25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026) .......... 11

*Virginia House of Delegates v. Bethune-Hill*,
587 U.S. 658 (2019) .......... 2, 5

*Yocha Dehe v. United States Department of the Interior*,
3 F.4th 427 (D.C. Cir. 2021) .......... 8

**Rules**

Federal Rule of Civil Procedure 20(a)(1) .......... 4

Federal Rule of Civil Procedure 24 .......... 4

**Other Authorities**

Reid J. Epstein & Nick Corasaniti,
*Trump, in an Escalation, Calls for Republicans to "Nationalize" Elections*, N.Y. TIMES, Feb. 2, 2026, https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html .......... 12

Restatement (Second) of Torts § 652B .......... 9

## INTRODUCTION

The United States seeks to compel the District of Columbia ("D.C.") to disclose voters' sensitive personal information apparently as part of never-before-seen efforts to construct a national voter database, and to otherwise use untested forms of database matching to scrutinize voter rolls. Proposed Intervenors—Common Cause, a nonpartisan organization dedicated to grassroots voter engagement in D.C. whose work and members would be directly affected by the relief the federal government seeks, and two D.C. voters, Ruth Goldman and Chris Melody Fields (collectively, the "Common Cause Intervenors")—move to intervene as defendants to seek dismissal alongside the existing Defendants, which seek the same relief. Mot. to Intervene as Defs., Dkt. 12. The intervention motion is unopposed. The only question the Court has raised is whether Article III nonetheless requires intervenor-defendants who seek the same relief as existing parties to establish independent standing. For the reasons discussed below, Article III imposes no such requirement; and even if it did, the Common Cause Intervenors satisfy it.

## ARGUMENT

As explained in their opening brief, the Common Cause Intervenors satisfy the requirements for intervention as of right and, at a minimum, permissive intervention under Federal Rule of Civil Procedure 24. Mem. in Supp. of Mot. to Intervene as Defs., Dkt. 12-1. Because their motion is unopposed, the only question remaining is whether Article III imposes an additional standing requirement on proposed intervenor-defendants—and, if so, whether that requirement is met here. Under settled doctrine, intervenor-defendants need not establish standing; but even if such a requirement applied, the Common Cause Intervenors easily meet it.

## I. The Common Cause Intervenors Are Not Required to Demonstrate Standing.

### A. Supreme Court Precedent Confirms Intervenors Need Standing Only if They Seek Unique Relief.

In 2020, the Supreme Court crystallized what its standing jurisprudence had long implied: an intervenor need not independently establish Article III standing to pursue an appeal when another litigant with standing seeks the same relief. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020). In *Little Sisters*, the Court explained that once a proper party has invoked appellate jurisdiction, an intervenor's separate standing is immaterial. *Id.* The Court therefore held that the Third Circuit "erred by inquiring into the [intervenor's] independent Article III standing," because that inquiry is required only if and when the intervenor "pursues relief that is broader than or different from the party invoking a court's jurisdiction." *Id.*

*Little Sisters* rests on three settled features of standing doctrine. First, Article III requires standing only from a party who seeks to "invoke the federal judicial power." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 618 (1989). The Court has accordingly emphasized that it is "the litigant invoking the court's jurisdiction" who must demonstrate standing—not every party before the court. *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019). That is why plaintiffs and appellants must establish standing, while defendants and appellees ordinarily need not. *Id.* To carry that burden, the invoking party must satisfy the familiar three-part test: a concrete and particularized injury, traceable to the challenged conduct, and redressable by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). These requirements enforce the Constitution's basic limitation that federal courts resolve real disputes—not "abstract questions," *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297–98 (1979), but only controversies

"traditionally thought to be capable of resolution through the judicial process," *Flast v. Cohen*, 392 U.S. 83, 97 (1968).

Second, standing is claim-specific. *See TransUnion*, 594 U.S. at 423. When a plaintiff seeks multiple forms of relief—thus invoking the judicial power in multiple ways—it must establish standing for each. *Id.* at 431; *see, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (plaintiff may have standing to seek damages but not an injunction). For Article III purposes, these distinct requests operate as distinct constitutional "cases or controversies," regardless of whether the Federal Rules of Civil Procedure permit them to be litigated together in a single civil action. *Cf. Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407–08 (2010) (Rules permitting joinder of parties and claims "regulate[] only the process for enforcing . . . rights; none alter[] the rights themselves, the available remedies, or the rules of decision by which the court adjudicate[] either").

Finally, once Article III is satisfied for a particular claim and form of relief, additional parties may rely on that same controversy without making an independent standing showing. The Court has explained that such litigants may "ride piggyback" on the standing of a party who properly invoked jurisdiction. *Diamond v. Charles*, 476 U.S. 54, 64 (1986). In that circumstance, identical claims are treated as part of the same constitutional case, so "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006); *see also, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 489 (2023).[1]

---

[1] This practice of treating similar claims as a single constitutional "case" is well-established in the other element of the case-or-controversy requirement: subject matter jurisdiction. Article III of the Constitution extends the "judicial Power" to nine categories of "Cases" and "Controversies," including "all Cases, in Law and Equity, arising under this Constitution" (federal-question cases)

The same principles apply to intervenors. In *Town of Chester, New York v. Laroe Estates, Inc.*, 581 U.S. 433 (2017), the Supreme Court explained that, whether a litigant joins as a co-plaintiff under Federal Rule of Civil Procedure 20(a)(1) or intervenes under Rule 24, the same standing principles apply. *Id.* at 439. A party must establish its own standing only if it "pursue[s] relief that is different from that which is sought by a party with standing." *Id.* at 440. *Little Sisters* reinforced and clarified this rule, holding that when an intervenor seeks relief identical to that of a party who has properly invoked the court's jurisdiction, the court should not examine the intervenor's independent Article III standing. 591 U.S. at 674 n.6. In other words, once a claim satisfies Article III, additional parties may join in pursuit of the same relief without relitigating the standing question.

To be clear, an intervenor's initial participation in an existing case does not forever relieve it of the constitutional requirement to establish standing if it seeks to do more. There is an important distinction between joining an ongoing case or controversy—which courts allow without needing to immediately scrutinize independent standing—and creating a new claim or seeking different relief, which does require demonstrating Article III standing. Like any litigant, an intervenor must establish standing when it actually invokes the judicial power of the court: if it presses new claims or seeks different relief, it must demonstrate standing in the district court; if it seeks to appeal on

---

and "Controversies . . . between Citizens of different States" (diversity cases). U.S. Const. art. III, § 2. Even if a case or controversy exists, a federal court has no "power to issue any form of relief" unless it also has "subject-matter jurisdiction over the case or controversy." *United States v. Denedo*, 556 U.S. 904, 911–12 (2009). In federal-question cases, courts may hear related state-law claims that "derive from a common nucleus of operative fact," making the entire action "but one constitutional 'case.'" *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). Similarly, in diversity cases, courts may adjudicate claims of additional plaintiffs who fail the amount-in-controversy threshold, so long as their claims are part of the same case or controversy. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 549 (2005). In both contexts, including a claim or party outside the court's original jurisdiction does not "contaminate[] every other claim in the complaint" or strip the court of otherwise proper jurisdiction. *Id.* at 560.

its own, it must do so in the court of appeals. Until that point, however, a court should not "inquir[e] into [its] independent Article III standing." *Id.*

The doctrine of constitutional avoidance counsels against examining an intervenor's standing unless and until such review is necessary for the court to exercise its judicial power. In our constitutional system, the authority to interpret the Constitution arises only from the "necessity to do so in the course of carrying out the judicial function of deciding cases." *DaimlerChrysler v. Cuno*, 547 U.S. 332, 340 (2006). As the Supreme Court has long emphasized, "[i]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that [courts] ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944); *see Clinton v. Jones*, 520 U.S. 681, 690 (1997) (the principle of avoiding premature constitutional adjudication "is applicable to the entire Federal Judiciary"). Accordingly, standing should be considered only at the point it becomes essential to the exercise of judicial authority.

Here, the Common Cause Intervenors need not establish Article III standing at this juncture because they are not invoking this Court's jurisdiction—they are joining an existing controversy in a defensive posture. They seek only to intervene as defendants and move to dismiss the complaint. *See* Proposed Mot. to Dismiss, Dkt. 12-2. The Supreme Court has squarely held that participation as an intervenor-defendant does not itself "entail[] invoking a court's jurisdiction," and thus does not demand an independent showing of standing. *Va. House of Delegates*, 587 U.S. at 663. In any event, to the extent the Common Cause Intervenors seek relief that would require invoking this Court's jurisdiction, that relief is identical to the relief sought by the existing Defendants, who indisputably have standing to invoke it. Because evaluating the Common Cause Intervenors' standing is not necessary at this stage, the Court should decline to do so.

### B. Any Contrary Circuit Precedent Is Displaced by Binding Supreme Court Authority.

At the motion hearing, the Court expressed concern that, despite the foregoing principles, it remained bound by older D.C. Circuit precedent requiring "all would-be intervenors [to] demonstrate Article III standing." *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1232 (D.C. Cir. 2018). But where intervening Supreme Court authority has "eviscerate[d]"—that is, effectively overruled—prior circuit precedent, lower courts must follow the Supreme Court. *Bahlul v. United States*, 77 F.4th 918, 925 (D.C. Cir. 2023). Districts courts are not free to disregard binding Supreme Court precedent in favor of older circuit authority.

That is exactly the case here. The earlier D.C. Circuit formulation required courts to assess the standing of all proposed intervenors categorically. *Old Dominion*, 892 F.3d at 1232 n.2. By contrast, the Supreme Court's more recent instruction is clear: courts may not demand an independent standing showing from intervenors unless they "pursue[] relief that is broader than or different from the party invoking a court's jurisdiction." *Little Sisters*, 591 U.S. at 674 n.6. These two rules cannot be reconciled. The old circuit formulation mandates standing for every intervenor; the Supreme Court holds that no showing is required where, as here, an intervenor seeks only to join a party already invoking the Court's jurisdiction. Under settled principles of judicial hierarchy, the Supreme Court's rule controls.

District courts in this Circuit have recognized this conclusion. Then-Judge Jackson explained that prior Circuit cases imposing a universal standing requirement for intervenors "predate, and are plainly inconsistent with, the Supreme Court's recent opinions." *Env't Integrity Project v. Wheeler*, No. 20-cv-1734, 2021 WL 6844257, at *2 (D.D.C. Jan. 27, 2021). Then-Judge Jackson held "that, because the Business Entities are seeking to intervene *as defendants*, and are not invoking the Court's jurisdiction—let alone seeking 'relief that is broader than or different

from the party invoking [the] [C]ourt's jurisdiction[,]'—they are not required to demonstrate that they have Article III standing." *Id.* (quoting *Little Sisters*, 591 U.S. at 674 n.6). Other courts have followed suit. *See Amgen Inc. v. Kennedy*, No. 24-cv-3571, 2026 WL 202157, at *2 (D.D.C. Jan. 27, 2026) ("To begin, [intervenor] seeks the same outcome as Defendants . . . so a standing analysis is unnecessary."); *Hannam Chain USA, Inc. v. NLRB*, No. 25-cv-2896, 2025 WL 4083334, at *2 n.1 (D.D.C. Sept. 27, 2025) ("[A] party seeking to intervene as a defendant, and without asserting any counter-or cross-claim . . . is not invoking the Court's jurisdiction or seeking relief that is broader than or different from the party invoking the Court's jurisdiction and thus is not required to show Article III standing." (internal quotation marks omitted)); *Childs.' Health Def. v. CDC*, No. 23-cv-431, 2024 WL 3521593, at *5 n.3 (D.D.C. July 24, 2024) ("[Intervenor] need not independently demonstrate Article III standing as a Defendant-Intervenor because it is not invoking the court's jurisdiction or seeking additional relief beyond the claims asserted by [existing party]" (internal quotation marks omitted).

The D.C. Circuit's recent decision in *Institutional Shareholder Services v. SEC*, 142 F.4th 757 (D.C. Cir. 2025), does not alter this analysis. There, the district court allowed intervention without requiring the intervenor to establish standing "because it was seeking the same relief as [an existing party]." *Id.* at 764. When the original party dismissed its appeal, the intervenor became the sole appellant, and the D.C. Circuit correctly required it to demonstrate standing to invoke appellate jurisdiction. *Id.* In a footnote, the panel acknowledged *Little Sisters*, noting that intervenors seeking the same relief as an existing party "need not" establish standing, and recognized that this holding "is in tension with some of our court's precedent requiring an intervenor to demonstrate Article III standing even if pursuing the same relief as an existing party." *Id.* at 764 n.3 (citing *Little Sisters*, 591 U.S. at 674 n.6). But the panel had no occasion to resolve

the tension because the intervenor, as the only appellant before the court, plainly had to establish standing. That the D.C. Circuit has not yet formally acknowledged that its prior rulings are effectively displaced does not excuse district courts from applying binding Supreme Court precedent—or prevent them from doing so here.[2]

## II. The Common Cause Intervenors Independently Satisfy Article III Standing.

Even if the Court were to reach the question, the Common Cause Intervenors plainly have Article III standing. Plaintiff seeks an order requiring "Defendants to provide to the Attorney General the current electronic copy of D.C.'s computerized voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their driver's license number, the last four digits of their Social Security number, or HAVA unique identifier." Compl. ¶ 32(b). That relief would inflict a concrete, personal injury on the Individual Intervenors by compelling disclosure of their highly sensitive personal information. It also gives Common Cause Article III standing because the requested relief would harm its members in the same way and would directly impair its core voter-registration activities in D.C.

### A. The Individual Intervenors Have Standing.

The Individual Intervenors have standing to prevent the disclosure of the private information contained in their voting file to the Department of Justice. To establish standing, a party must show injury in fact, causation, and redressability. *TransUnion*, 594 U.S. at 423. Where

---

[2] The *Institutional Shareholder Services* panel also cited a 2021 D.C. Circuit opinion that applied pre-*Little Sisters* precedent without addressing the Supreme Court's intervening guidance. *See* 142 F.4th at 764 n.3 (citing *Yocha Dehe v. Dep't of the Interior*, 3 F.4th 427, 430–32 (D.C. Cir. 2021)). But the intervenor in that case did not dispute that it was required to establish Article III standing, and its briefing focused on persuading the court that it met the requirement. *See* Appellant's Final Opening Br. at 4, *Yocha Dehe v. Dep't of the Interior*, No. 21-5009 (D.C. Cir. July 6, 2021), 2021 WL 1265226. While courts generally should not inquire into the standing of intervenors seeking the same relief as an existing party, nothing prevents a court from considering standing when the intervenor itself asks the court to do so. The panel's analysis in *Yocha Dehe* reflects precisely that circumstance and does not undermine the governing rule from *Little Sisters*.

intervenor-defendants must make that showing, the latter two elements are satisfied once injury in fact is established, because the alleged injury flows directly from the relief the plaintiff seeks and would be redressed by defeating that request in this action. *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 316 (D.C. Cir. 2015). The standing inquiry here therefore turns on a single question: whether the compelled disclosure of a voter's unredacted voting file—including their partial Social Security numbers and full driver's license numbers—constitutes an injury in fact.

An injury in fact must be "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992)). That standard is met here. The injury is particularized because it concerns each intervenor's own personal data, and it is certainly impending because disclosure will occur if Plaintiff prevails. Concreteness is satisfied where the harm has a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425. The Court need not demand an "exact duplicate" of a historical harm, and Congress's judgment may be "instructive" in identifying cognizable injuries, *id.* at 424–25. *TransUnion* identified three illustrative examples of intangible but concrete harms: reputational harms, disclosure of private information, and intrusion upon seclusion. *Id.*

The injury here tracks the common-law torn of intrusion upon seclusion. At common law, liability attaches when a defendant intentionally intrudes "upon the solitude or seclusion of another or his private affairs or concerns" in a manner "highly offensive to a reasonable person." *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 102 (D.D.C. 2025) (quoting Restatement (Second) of Torts § 652B). Crucially, that tort does not require publication: "[t]he intrusion itself makes the defendant subject to liability." *Id.* (quoting Restatement § 652 cmt. b).

First, the requested data plainly concerns "private affairs or concerns." Courts assessing intrusion claims frequently ask whether the plaintiff had a reasonable expectation of privacy in the information at issue. *Id.* at 102 & n.6 (collecting cases). Here, the voting records include partial Social Security numbers and full driver's license numbers—precisely the sort of sensitive identifying data that courts consistently treat as private. For example, other courts addressing voter-file disclosures have likewise held that such information is "highly personal and intimate" and triggers a reasonable expectation of privacy. *Moore v. Kobach*, 359 F. Supp. 3d 1029, 1050 (D. Kan. 2019) (holding that plaintiffs stated claim to a constitutional right to privacy in their partial Social Security and driver's license numbers contained in voter files); *United States v. Weber*, No. 2:25-cv-09149, 2026 WL 118807, at *9 (C.D. Cal. Jan. 15, 2026) (describing partial Social Security and driver's license numbers contained in voter file as "private and not open to inspection by federal officials"); *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases holding that the National Voter Registration Act permits courts to redact private information, including partial Social Security and driver's license numbers before public disclosure).[3] Indeed, the intervenors attest that they in fact expect this information to remain confidential. *See* Dkt. 12-4 at 3 (Goldman Decl. ¶ 6) ("I am outraged and alarmed at the prospect of my personal sensitive information from the District of Columbia's voter rolls being turned over to the U.S. Department of Justice."); Dkt. 12-5 at 2 (Fields Decl. ¶ 8) (similar).

Second, compelled access to that information would be highly offensive to a reasonable person. That inquiry turns largely on social norms and expectations. *All. for Retired Ams.*, 770 F. Supp. 3d at 103. The D.C. Court of Appeals has recognized that unauthorized viewing of sensitive

---

[3] *See also In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999) (collecting sources affirming "that the disclosure of [social security numbers] can raise serious privacy concerns").

identifiers—such as Social Security numbers—can itself constitute an offensive intrusion given the well-known risks of misuse and identity theft. *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009). The intervenors' sworn statements expressing alarm at the prospect of disclosure only underscore what common experience already establishes: no reasonable person expects the federal government to seize their most sensitive personal identifiers—especially when it is using that information to build a nationwide voter database to federalize elections and is deliberately opaque about its true purposes. *See United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026) ("The presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds. When Plaintiff, in this case, conveys assurances that any private and sensitive data will remain private and used only for a declared and limited purpose, it must be thoroughly scrutinized and squared with its open and public statements to the contrary.").

Congress's own enactments reinforce that conclusion. Federal statutes such as the Driver's Privacy Protection Act and the Privacy Act reflect legislative judgment that partial Social Security numbers and driver's license numbers are sensitive personal information whose misuse causes real harm. Courts must give weight to Congress's decision to recognize and protect such injuries when assessing concreteness. *See Spokeo*, 578 U.S. at 340–01; *see, e.g.*, *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 428 (4th Cir. 2025) (finding that disclosure of driver's license numbers constitutes a concrete injury in fact, relying in part on the fact that Congress protected those numbers from disclosure).

Taken together, these considerations establish concreteness because the threatened disclosure is an imminent invasion of personal privacy closely analogous to a traditionally actionable intrusion upon seclusion. That injury is anything but speculative: it is all but confirmed

by the federal government's acknowledged efforts to build a national voter database and conduct unprecedented cross-agency matching as part of President Trump's self-described effort to "nationalize" elections.[4]

**B. Common Cause Has Standing.**

Common Cause has both associational and organizational standing. It has associational standing on behalf of its approximately 3,000 members in D.C. who would have standing in their own right—like the individual intervenors, *see supra* II.A—to challenge disclosure of their personal information. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (associational standing). Because these members face a concrete and imminent privacy threat, Common Cause may vindicate their interests directly.

Common Cause also has organizational standing because the threatened disclosure directly impairs one of its core activities: assisting eligible voters with registration and registration verification. The D.C. Circuit has squarely held that government action that "make[s] it more difficult [for voter-engagement organizations] to accomplish their primary mission" constitutes an injury in fact. *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *see also, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-cv-946, 2025 WL 3042704, at *15 (D.D.C. Oct. 31, 2025) (voter-engagement organizations have standing to challenge documentary-proof-of-citizen requirement because it would "make existing voter registration efforts less effective"). Common Cause conducts voter-engagement work in D.C. through an online registration and verification tool used by hundreds of residents, in-person mobilization events, and volunteer trainings. Ex. A at 3 (Isabella Bronstein Decl. ¶¶ 7–8). Its

4 Reid J. Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to "Nationalize" Elections*, N.Y. TIMES, Feb. 2, 2026, https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html.

Senior Campaign Director attests, based on a decade interacting with Common Cause members and working on voter mobilization, that the federal government's demand for D.C.'s voter rolls is likely to deter participation. *Id* at 3 (Bronstein Decl. ¶ 9). She frequently encounters potential voters who hesitate to register because they fear their personal information will not be protected from federal access, especially given the unique federal authority over D.C. *Id.* (Bronstein Decl. ¶¶ 9–10). These fears have intensified over the past year, with individuals citing federal actions affecting D.C. Home Rule—including patrols of federal agents on D.C. streets—and the work of the Department of Government Efficiency as reasons they worry D.C. will be unable to protect their voter registration information. *Id.* (Bronstein Decl. ¶ 10). These fears are especially pronounced among immigrant communities and formerly incarcerated individuals, who are concerned their data could be misused or trigger investigations. *Id.* at 4 (Bronstein Decl. ¶ 11). This chilling effect directly impairs Common Cause's voter-engagement activities and constitutes a cognizable Article III injury.

Because Common Cause's members face imminent disclosure of their private information and the organization itself will suffer mission-related harms if that disclosure occurs, Article III standing is satisfied on both associational and organizational grounds.

## CONCLUSION

For the foregoing reasons, the Common Cause Intervenors respectfully request the Court grant their motion to intervene.

Dated: February 24, 2026

Respectfully submitted,

*/s/ Ethan Herenstein*
Ethan Herenstein*
Sophia Lin Lakin*
Theresa Lee*

Sarah Brannon (D.C. Bar No. 90024493)
Adriel I. Cepeda Derieux (D.C. Bar No. 90026636)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION

915 15th St. NW
Washington, DC 20001
(347) 714-1530
sbannon@aclu.org
acepedaderieux@aclu.org

Jonathan Topaz*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
eherenstein@aclu.org
slakin@aclu.org
tlee@aclu.org
jtopaz@aclu.org

* admitted *pro hac vice*

*Counsel for Proposed Intervenors Common Cause, Ruth Goldman, and Chris Melody Fields*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record on February 24, 2026.

*/s/ Ethan Herenstein*
Ethan Herenstein