ANTHONY G. BROWN
Attorney General of Maryland

VIRGINIA A. WILLIAMSON (Bar No. D00525)
Assistant Attorney General
vwilliamson@oag.maryland.gov
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 210202
(410) 576-6584

Attorneys For Amicus Curiae State of Maryland

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | Case No.: 1:25-cv-4403 (RDM) |
| *Plaintiff*, | * | **BRIEF OF AMICI CURIAE MARYLAND, MINNESOTA, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, MAINE, MICHIGAN, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF MOTIONS TO DISMISS** |
| v. | * | |
| | * | |
| MONICA H. EVANS, in her official capacity as Executive Director for the District of Columbia Board of Elections, *et al.* | * | |
| *Defendants*. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**TABLE OF CONTENTS**

Page

I.    THE GOVERNMENT'S DEMAND FOR UNREDACTED VOTER REGISTRATION
      DATABASES IS PART OF A BROADER EFFORT TO COLLECT UNPRECEDENTED
      AMOUNTS OF PERSONAL INFORMATION. ................................................................. 2

      A.    The Federal Government Has Unlawfully Demanded SNAP Data. ............. 4

      B.    Federal Health Agencies Have Unlawfully Shared State-Compiled
            Medicaid Data for Immigration Enforcement Purposes. ............................. 5

      C.    The Federal Government Demands Voter Registration Databases.............. 6

II.   THE UNITED STATES' DEMAND FOR UNREDACTED VOTER REGISTRATION
      DATABASES DOES NOT ENTITLE IT TO EXPEDITED PROCEEDINGS. ........................ 9

III.  THE CIVIL RIGHTS ACT DOES NOT PERMIT THE FEDERAL GOVERNMENT TO
      DEMAND UNREDACTED VOTER REGISTRATION DATABASES................................ 13

      A.    States Have Primary Authority over Elections, and the Department of
            Justice's Demands Are Unconstitutional Because They Exceed the
            Scope of Authorizing Statutes. ................................................................. 13

      B.    The Civil Rights Act of 1960 Does Not Authorize the Department of
            Justice's Demands for Voter Registration Data Unrelated to Civil
            Rights Violations. ..................................................................................... 15

## TABLE OF AUTHORITIES

**Page**

### Cases

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) .................................................. 9

*California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025) ....................................................... 10

*California v. U.S. Dep't of Agric.*, No. 3:25-cv-06310, 2025 WL 2939227
    (N.D. Cal. Oct. 15, 2025) ..................................................................................................10

*California v. U.S. Dep't of Health & Hum. Servs.*, No. 3:25-cv-05536-VC, 2025 WL 2356224
    (N.D. Cal. Aug. 12, 2025) ...................................................................................................6

*California v. U.S. Dep't of Health & Hum. Servs.*, No. 3:25-cv-05536-VC, 2025 WL 3751931
    (N.D. Cal. Dec. 29, 2025) ...................................................................................................6

*Husted v. A. Philip Randolph Inst.*, 584 U.S. 756 (2018) .................................................. 9

*League of United Am. Citizens v. Executive Off. of the President*, 780 F. Supp. 3d 135
    (D.D.C. 2025) ...................................................................................................... 10

*Moore v. Kobach*, 359 F. Supp. 3d 1029 (D. Kan. 2019) .................................................. 9

*Peters v. United States*, 853 F.2d 692 (9th Cir. 1988) ................................................... 14

*Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016) ......................................... 9, 14

*Public Int. Legal Found. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) ............................................ 9, 14

*Public Int. Legal Found. v. North Carolina State Bd. of Elections*, 996 F.3d 257
    (4th Cir. 2021) ...................................................................................................... 9, 14

*Smiley v. Holm*, 285 U.S. 355 (1932) ............................................................................... 9

*Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986) .......................................... 9

*True the Vote v. Hosemann*, 43 F. Supp. 3d 693 (S.D. Miss. 2013) ......................................... 9, 14

*United States v. Benson*, ___ F. Supp. 3d ___, No. 1:25-CV-01148, 2026 WL 362789
    (W.D. Mich. Feb. 10, 2026) ...................................................................................2

*United States v. Classic*, 313 U.S. 299 (1941) .................................................................. 9

*United States v. Michigan*, 866 F. Supp. 890 (W.D. Mich. 1994) .................................................15

*United States v. Oregon*, No. 6:25-CV-01666, 2026 WL 318402
(D. Or. Feb. 5, 2026)........................................................................................................2

*United States v. Weber*, ___ F. Supp. 3d ___, No. 2:25-cv-09149, 2026 WL 118807
(C.D. Cal. Jan. 15, 2026) ........................................................................ 1, 10, 11

**Statutes**

2 U.S.C. § 1396b............................................................................................................... 5

5 U.S.C. § 552a........................................................................................................... 11, 12

7 U.S.C. § 2020................................................................................................................. 3

8 U.S.C. §§ 1612.............................................................................................................. 4

15 U.S.C. § 1312............................................................................................................. 15

29 U.S.C. § 1134............................................................................................................. 15

31 U.S.C. § 3733............................................................................................................. 15

42 U.S.C. § 1306............................................................................................................... 5

42 U.S.C. § 1997a-1........................................................................................................ 15

52 U.S.C. § 20503........................................................................................................... 13

52 U.S.C. § 20507........................................................................................................ 8, 13

52 U.S.C. § 20703........................................................................................................... 15

52 U.S.C. § 21083........................................................................................................ 6, 12

52 U.S.C. § 21111........................................................................................................... 14

E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002)...................................... 2

Paperwork Reduction Act of 1995, Pub. L. No. 104-13, 109 Stat. 163 (1995).............................. 2

Privacy Act of 1974, Pub L. No. 93-579, 88 Stat. 1896 (1974) ...................................................... 2

Ala. Code § 17-3-53.......................................................................................................... 9

Alaska Stat. § 15.07.195 ................................................................................................... 9

Ariz. Rev. Stat. Ann. § 16-152........................................................................................... 8

Ariz. Rev. Stat. Ann. § 16-153........................................................................................... 9

Ariz. Rev. Stat. Ann. § 16-168 ................................................................................................. 9

Cal. Election Code § 2166 ........................................................................................................ 9

Cal. Election Code § 2194 ........................................................................................................ 9

Cal. Welf. & Inst. Code § 10850 .............................................................................................. 4

Colo. Rev. Stat. § 1-2-302 ........................................................................................................ 9

Conn. Gen. Stat. § 9-23h .......................................................................................................... 9

Del. Code Ann. tit. 15, § 1305 ................................................................................................. 9

D.C. Mun. Regs. tit. 3, § 510.5 ............................................................................................... 9

Fla. Stat. § 97.0585 .................................................................................................................. 9

Ga. Code Ann. § 21-2-225 ....................................................................................................... 9

Ga. Code Ann. § 21-2-417 ....................................................................................................... 8

Haw. Rev. Stat. § 11-14 ........................................................................................................... 9

Haw. Rev. Stat. § 11-97 ........................................................................................................... 9

Idaho Code § 34-437 ................................................................................................................ 9

Idaho Code § 34-437A ............................................................................................................. 9

10 Ill. Rev. Stat. 5A/1A-25 .................................................................................................... 10

Ind. Code § 3-7-26.4-6 ........................................................................................................... 10

Ind. Code § 3-7-26.4-8 ........................................................................................................... 10

Ind. Code § 3-7-26.4-10 ......................................................................................................... 10

Iowa Code §§ 48A.38 ............................................................................................................. 10

Iowa Code §§ 48A.39 ............................................................................................................. 10

Kan. Stat. Ann. § 25-2320 ...................................................................................................... 10

Kan. Stat. Ann. § 25-2320a ..................................................................................................... 10

Ky. Rev. Stat. Ann. § 116.095 ............................................................................................... 10

Ky. Rev. Stat. Ann. § 117.025 ............................................................................................... 10

La. Stat. Ann. § 18:104 .................................................................................................... 8

La. Stat. Ann. § 18:154 .................................................................................................. 10

Mass. Gen. Laws ch. 51, § 47C ................................................................................. 8, 10

Me. Stat. tit. 21-A, § 196A........................................................................................... 10

Md. Code Ann., Elec. Law § 3-506 .............................................................................. 10

Md. Code Ann., Gen. Provis. § 4-301 ............................................................................. 4

Md. Code Ann., Hum. Servs. § 1-201 ............................................................................. 4

Mich. Comp. Laws § 169.168.509gg............................................................................ 10

Minn. Stat. § 201.091.................................................................................................... 10

1 Miss. Code R. pt. 10, R. 7.2 ...................................................................................... 10

Mo. Rev. Stat. § 115.157 ........................................................................................... 8, 10

Mont. Admin. R. 44.3.1102 .......................................................................................... 10

Mont. Code Ann. § 13-2-110.......................................................................................... 8

Mont. Code Ann. § 13-2-122 ........................................................................................ 10

N.C. Gen. Stat. § 163-82.10.......................................................................................... 10

N.D. Cent. Code § 16.1-02-15 ...................................................................................... 10

Neb. Rev. Stat. § 32-330............................................................................................... 10

Nev. Rev. Stat. § 293.440 ............................................................................................. 10

Nev. Rev. Stat. § 293.558 ............................................................................................. 10

N.H. Rev. Stat. Ann. § 659:13-b..................................................................................... 8

N.H. Rev. Stat. Ann. § 654:31 ...................................................................................... 10

N.H. Rev. Stat. Ann. § 654:31-a ................................................................................... 10

N.J. Stat. Ann. § 19:31-6.4.............................................................................................. 8

N.J. Stat. Ann. § 19:31-18.1.......................................................................................... 10

N.M. Stat. Ann. § 1-4-5.4 ............................................................................................. 10

iv

N.M. Stat. Ann. § 1-4-5.5 ........................................................................................... 10

N.Y. Elec. Law § 3-103 ............................................................................................... 10

N.Y. Elec. Law § 8-303 ................................................................................................. 8

Ohio Rev. Code Ann. § 3503.13 ................................................................................. 10

Okla. Stat. tit. 26, § 4-112 .......................................................................................... 10

Okla. Stat. tit. 26, § 7-103.2 ...................................................................................... 10

Or. Rev. Stat. § 247.948 .............................................................................................. 10

Or. Rev. Stat. § 247.955 .............................................................................................. 10

25 Pa. Cons. Stat. § 1404 ........................................................................................... 10

17 R.I. Gen. Laws § 17-9.1-21 ................................................................................... 10

S.C. Code Ann. § 7-5-170 ............................................................................................. 8

S.D. Codified Laws § 12-4-9 ...................................................................................... 10

Tenn. Code Ann. § 2-2-116 ........................................................................................... 8

Tenn. Code Ann. § 2-2-127 ......................................................................................... 10

Tenn. Code Ann. § 2-2-138 ......................................................................................... 10

Tex. Elec. Code Ann. § 18.009 ................................................................................... 10

Utah Code Ann. § 20A-2-104 ..................................................................................... 10

Va. Code Ann. § 24.2-407.1 ........................................................................................ 10

Vt. Stat. Ann. tit. 17, § 2154 ...................................................................................... 10

W. Va. Code 3-2-30 .................................................................................................... 10

Wash. Rev. Code § 29A.08.710 .................................................................................. 10

Wash. Rev. Code § 29A.08.720 .................................................................................. 10

Wis. Stat. § 6.34 ............................................................................................................ 8

Wis. Stat. § 6.36 ......................................................................................................... 10

Wyo. Stat. Ann. 22-2-113 .......................................................................................... 10

**Regulations**

7 C.F.R. § 271.4 ................................................................................................................. 3

7 C.F.R. § 273.2 ................................................................................................................. 3

28 C.F.R. § 16.54 ............................................................................................................. 11

42 C.F.R. § 438.818 ........................................................................................................... 5

Md. Code Regs. 33.05.02.02 ............................................................................................ 10

**Miscellaneous**

Ballotpedia, *Partisan Affiliations of Registered Voters* (Aug. 31, 2025) ....................................... 8

Brennan Center for Justice, *Tracker of Justice Department Requests for Voter Information* ........ 7

Charles Doyle, Cong. Rsch. Serv., RL33321, *Administrative Subpoenas in Criminal Investigations: A Brief Legal Analysis* (Dec. 19, 2012) ............................................................. 15

CMS Information Security & Privacy Program, *Privacy: Overview*, https://tinyurl.com/mrh8vjsj (last visited Nov. 21, 2025) ........................................................... 5

Executive Order No. 14243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, 90 Fed. Reg. 13,681 (Mar. 20, 2025) ........................................................... 2

Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14,005 (Mar. 25, 2025) ................................................................................. 2

Kimberly Kindy & Amanda Seitz, *Trump Administration Gives Personal Data of Immigrant Medicaid Enrollees to Deportation Officials*, Associated Press (June 14, 2025) ... 5

Kimberly Kindy & Amanda Seitz, *Trump Administration Hands Over Medicaid Recipients' Personal Data, Including Addresses, to ICE*, Associated Press (July 17, 2025) ..................... 6

Press Release, *Secretary Rollins Requires States to Provide Records on SNAP Benefits, Ensure Lawful Use of Federal Funds* (May 6, 2025) ............................................................... 4

Priscilla Alvarez et al., *DOGE Is Building a Master Database for Immigration Enforcement, Sources Say*, CNN (Apr. 25, 2025) ..................................................................... 3

*Report of the United States Commission on Civil Rights* (Sept. 9, 1959) .............................. 16, 17

*Report of United States Commission on Civil Rights* (Sept. 30, 1963) .................................... 18

U.S. Dep't of Just., *Overview of the Privacy Act of 1974: 2020 Edition* ................................... 11

U.S. Dep't of Just., Office of Legal Policy, *Report to Congress on the Use of Administrative Subpoena Authorities by Executive Branch Agencies and Entities* § I.A (2002) ................... 15

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey: 2024 Comprehensive Report* 132 (June 2025) ................................................................................. 7

U.S. Election Assistance Comm'n, *Voter Roll Privacy* (Mar. 15, 2024) ...................................... 7

**STATEMENT OF INTEREST**

Amici curiae the States of Maryland, Minnesota, Arizona, California, Colorado, Connecticut, Delaware, Hawaiʻi, Maine, Michigan, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington ("the Amici States") submit this brief supporting the pending motions to dismiss. The Amici States have a strong interest in this case because the federal government's demands for States' voter data are not limited to the District of Columbia. Each of the Amici States has received similar sweeping demands, and the United States has already sued 29 States, including all of the Amici States, in addition to the District of Columbia. As set forth more fully below, the Constitution guarantees to the Amici States primary authority over election procedures. In addition to this constitutional interest, the Amici States have strong statutory and policy interests in safeguarding the privacy of their residents' most sensitive data and ensuring their residents' confidence, trust, and participation in the electoral process.

**ARGUMENT**

For the past twelve months, the federal government has engaged in an unprecedented campaign to sweep up significant volumes of sensitive personal data on those living within its borders, including, and especially targeting data collected and possessed by States and the District of Columbia. The United States has now come for States' and the District of Columbia's voter registration databases, under the guise of checking for compliance with federal list-maintenance laws. But the federal government is not charged with maintaining voter registration lists, and the information sought does not aid the federal government's limited compliance-enforcement role. Because the Constitution and federal statutes preclude the United States' demands, the Complaint should be dismissed. *See United States v. Weber*, ___ F. Supp. 3d ___, No. 2:25-cv-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) (dismissing the United States' suit in California because the

its "proffered statement and purpose, as required under the statute, [was] both lacking in depth and . . . contrived"); *see also United States v. Oregon*, No. 6:25-CV-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026) (dismissing the United States' suit in Oregon for, among other issues, the failure to provide a sufficient basis and purpose for its demand); *United States v. Benson*, ___ F. Supp. 3d ___, No. 1:25-CV-01148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) (dismissing the United States' suit in Michigan because the Civil Rights Act of 1960 does not apply to modern voter registration databases).

I.      **THE GOVERNMENT'S DEMAND FOR UNREDACTED VOTER REGISTRATION DATABASES IS PART OF A BROADER EFFORT TO COLLECT UNPRECEDENTED AMOUNTS OF PERSONAL INFORMATION.**

Multiple layers of federal law limit how the Executive Branch can gather, aggregate, and share personal information. *See, e.g.*, Privacy Act of 1974, Pub L. No. 93-579, 88 Stat. 1896 (1974); E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Paperwork Reduction Act of 1995, Pub. L. No. 104-13, 109 Stat. 163 (1995). Still, in March 2025, the President issued two executive orders directing federal officials to undertake novel efforts to aggregate federal and state records containing millions of individuals' personal information. Governmental efforts undertaken in accordance with those orders have been challenged and, for the most part, enjoined as unconstitutional or unlawful.

The first executive order, issued on March 20, 2025, commanded federal officials across agencies to synthesize "agency records, data, software systems, and information technology systems" to pursue "Administration priorities" related to "waste, fraud, and abuse." Executive Order No. 14243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, § 3(a), 90 Fed. Reg. 13,681 (Mar. 20, 2025). The order further directed federal officials to establish "unfettered access to comprehensive data *from all State programs* that receive federal funding." *Id*. § 3(b) (emphasis added).

A second executive order, issued on March 25, 2025, sought to impose new requirements on the conduct of federal elections. Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14,005 (Mar. 25, 2025). The President directed the Department of Homeland Security and Administrator of the Department of Government Efficiency to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities," and to compare the publicly available data to "Federal immigration databases and State records requested" to ensure "consistency with Federal requirements." *Id.* § 2(b)(iii).

Subsequent to these orders, the federal government began taking unprecedented steps to collect and pool Americans' personal data and to pressure States and the District of Columbia into assisting with this effort. The federal government enlisted technology company Palantir to build a massive repository of data pulled from federal agencies, including the Internal Revenue Service, the Social Security Administration, and the Department of Health and Human Services ("HHS"), to facilitate immigration enforcement and deportations.[1] At the same time, federal agencies have pressed States to turn over sensitive, personal data collected in administering vital programs like the Supplemental Nutrition Assistance Program ("SNAP"). Seeking to preserve their residents' privacy and the integrity of these programs, the Amici States have repeatedly challenged these unlawful demands. The Department of Justice's demands for voter registration data must be viewed in the context of these broader efforts to collect and aggregate personal information, including, as set forth below, efforts targeting States' SNAP and Medicaid data.

---

[1] Priscilla Alvarez et al., *DOGE Is Building a Master Database for Immigration Enforcement, Sources Say*, CNN (Apr. 25, 2025), https://tinyurl.com/4bcurxw4.

### A.    The Federal Government Has Unlawfully Demanded SNAP Data.

For sixty years, the Amici States have administered SNAP, which provides low-income families with modest monthly funds to buy groceries.  Federal law delegates to the States the roles of creating and processing SNAP applications, determining eligibility, issuing benefits, and ensuring program integrity.  7 U.S.C. § 2020(a)(1); *see also* 7 C.F.R. § 271.4.  To administer SNAP, each State collects extensive personal information, including applicants' and recipients' names, home addresses, and Social Security numbers.  *See* 7 C.F.R. § 273.2(b), (f)(1)(v).  Federal law requires that States develop "safeguards which prohibit the use or disclosure of information obtained from applicant households," subject only to narrow exceptions.  7 U.S.C. § 2020(e)(8).  And State laws throughout the country likewise protect the confidentiality of SNAP data.  *See, e.g.*, Cal. Welf. & Inst. Code § 10850(a); Md. Code Ann., Hum. Servs. § 1-201; Md. Code Ann., Gen. Provis. §§ 4-301(a), 4-307; Md. Code Regs. 07.01.07.01 – 07.01.07.12.

Despite these restrictions, in mid-2025, the U.S. Department of Agriculture ("USDA")—which, through a subagency, oversees the States' administration of SNAP—attempted to obtain the States' SNAP participant data from January 1, 2020 to the present.[2]  USDA first requested this data from the States' vendors.  Then, it directly notified state agencies of its intent to collect SNAP data.  And in June, it published formal notice of its intent to demand SNAP data to compile a national database.  National Supplemental Nutrition Association Program (SNAP) Information Database, 90 Fed. Reg. 26,521 (June 23, 2025).

Twenty-two States and the District of Columbia sued, asserting, among other things, that USDA's demands violated the Administrative Procedure Act because they contravened federal

---

[2] Press Release, *Secretary Rollins Requires States to Provide Records on SNAP Benefits, Ensure Lawful Use of Federal Funds* (May 6, 2025), https://tinyurl.com/5yvbdwxt.

law, were arbitrary and capricious, and flouted notice-and-comment requirements. *California v. U.S. Dep't of Agric.*, No. 3:25-cv-06310 (N.D. Cal.), Dkt. 1. The district court entered a preliminary injunction, holding that the plaintiff States were generally likely to succeed on the merits of their contrary-to-law claim. *California v. U.S. Dep't of Agric.*, No. 3:25-cv-06310, 2025 WL 2939227 (N.D. Cal. Oct. 15, 2025).

**B.      Federal Health Agencies Have Unlawfully Shared State-Compiled Medicaid Data for Immigration Enforcement Purposes.**

State agencies administer Medicaid, a joint federal-state insurance program that provides healthcare coverage to individuals with low income or disabilities. As federal law permits, *see* 8 U.S.C. §§ 1612, 1613, some States allow non-U.S. citizens to enroll in Medicaid programs, although their coverage is paid for exclusively with the States' own funds. States collect sensitive personal information from all Medicaid applicants and participants, and routinely share portions of it with HHS's Centers for Medicare & Medicaid Services ("CMS"), as required by law. *See* 42 U.S.C. § 1396b(r)(1)(F); 42 C.F.R. § 438.818. Some States' Medicaid data sets include information about enrollees' immigration status.

Historically, States have furnished their Medicaid applicant information to CMS with the expectation that the agency will observe all legal constraints, including the Social Security Act's prohibition against disclosure (including to other federal agencies) unless permitted by regulation or other federal law. 42 U.S.C. § 1306(a)(1). States have also done so keeping in mind CMS's longstanding policy of not sharing patients' personal data for non-healthcare-related reasons. *See* CMS Information Security & Privacy Program, *Privacy: Overview*, https://tinyurl.com/ mrh8vjsj (last visited Feb 5, 2026). Neither regulation nor other federal law authorized the large-scale transfer of protected health information to the Department of Homeland Security ("DHS").

5

Nonetheless, in June 2025, CMS transferred a trove of protected health data to DHS. The transferred data included Medicaid data compiled by California, Washington, Illinois, and the District of Columbia, even though those jurisdictions had not consented.[3] Thereafter, CMS executed a data-sharing agreement that provided Immigration and Customs Enforcement ("ICE") with access to the personal data of 79 million Medicaid enrollees, including home address and ethnicities, for immigration enforcement efforts.[4]

Twenty states filed a lawsuit challenging CMS's disclosure. *California v. U.S. Dep't of Health & Hum. Servs.*, No. 3:25-cv-05536-VC (N.D. Cal.). In August 2025, a district court preliminarily enjoined HHS from sharing the plaintiff States' Medicaid data with DHS for immigration enforcement purposes. *Id.*, 2025 WL 2356224 (N.D. Cal. Aug. 12, 2025), at *4–5.[5] In December 2025, the district court declined to enjoin HHS from sharing basic biographical data pertaining to undocumented persons, but again enjoined sharing data plaintiff States' Medicaid data contained regarding citizens and lawful residents. *Id.*, 2025 WL 3751931 (N.D. Cal. Dec. 29, 2025).

### C.      The Federal Government Demands Voter Registration Databases.

Apparently undeterred by federal court orders enjoining the improper collection and sharing of sensitive data, the federal government has initiated this litigation (and numerous parallel

---

[3] *See* Kimberly Kindy & Amanda Seitz, *Trump Administration Gives Personal Data of Immigrant Medicaid Enrollees to Deportation Officials*, Associated Press (June 14, 2025), https://tinyurl.com/bdt338e9.

[4] *See* Kimberly Kindy & Amanda Seitz, *Trump Administration Hands Over Medicaid Recipients' Personal Data, Including Addresses, to ICE*, Associated Press (July 17, 2025), https://tinyurl.com/32xwt9ws.

[5] The district court later extended its preliminary injunction order to two more States that had joined the litigation following the court's initial order. *California*, No. 3:25-cv-05536-VC, Dkt. 127.

lawsuits against States) seeking a full, electronic copy of the District of Columbia's computerized voter-registration database, including "all fields" within the database. (*See* ECF 1, at 7–8.) For every State and the District of Columbia, the requested data would include personally identifying information used to verify voters' identities, including the last four digits of voters' Social Security and driver's license numbers. *See* 52 U.S.C. § 21083(a)(5)(A)(i). It would also include information whose disclosure federal law expressly restricts—specifically, the voter registration agencies (such as agencies that provide public assistance) through which voters registered to vote. *Id.* § 20507(i)(1). The requested data is not only the type that raises general concerns regarding identity theft, privacy, and government overreach; it could also unmask specific voters enrolled in programs that protect the home addresses of victims of domestic and sexual violence, law enforcement officers, and judicial officials. *See* U.S. Election Assistance Comm'n, *Voter Roll Privacy* (Mar. 15, 2024), https://tinyurl.com/48r7skn3.

In the same demands, the federal government also has sought information *about* States' voter registration databases. The Department of Justice directed States to disclose "materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy" of the list. *See United States v. Weber*, No. 2:25-CV-09149, Dkt. No. 37-2, at 148 (Nov. 7, 2025) (collecting demand letters sent to 30 States). It included examples of such materials, including a "database user manual" or "coding list." *Id.* The federal government did not clarify *why* it needed those materials. But it seemingly sought to obtain more than read-only access to the computerized database files, potentially because additional information about the database coding would assist in transferring data from State voter registries into other federal databases. To the Amici States' knowledge, the federal government has demanded voter database information from 48 States and the District of Columbia; only twelve have provided complete,

7

unredacted information in response.  Brennan Center for Justice, *Tracker of Justice Department Requests for Voter Information*, https://tinyurl.com/532npb34.

By its very nature, a voter registration database is a unique repository of information.  As of the 2024 general election, 86.6% of the estimated national citizen voting-age population was registered to vote.  U.S. Election Assistance Comm'n, *Election Administration and Voting Survey: 2024 Comprehensive Report* 132, 156-60 (June 2025).  Most States reported rates greater than 80%, with sixteen reporting more than 90%.  *See id.* at 156-60.  Moreover, 32 States and the District of Columbia permit pre-registration, i.e., registration by an underage applicant, which becomes active when the applicant turns 18.  *Id.* at 173-74.  Those jurisdictions reported recording 1.18 million pre-registrations between 2022 and 2024.  *Id.* at 174.

In addition to the personal information that election officials must collect to verify voter identity and eligibility, voter registration databases may contain information about a voter's electoral participation necessary to administering the State's elections.  In all States, this includes information on whether a voter actually participated in an election, because federal law requires States to remove inactive voters who move out of a jurisdiction.  *See* 52 U.S.C. § 20507(d)(1)(ii).  And in 30 States and the District of Columbia, this includes information about party affiliation.  Ballotpedia, *Partisan Affiliations of Registered Voters* (Aug. 31, 2025), https://tinyurl.com/yx2aec8b.  Additionally, voter registration databases may contain information on a variety of sensitive topics (used to assist with voting or verify residency), such as disability, religious beliefs, occupation, parents' names, and criminal history, along with documents that include sensitive information, such as paychecks and bank statements.[6]  Obliging a demand for unredacted voter

---

[6] *See, e.g.*, Ariz. Rev. Stat. Ann. § 16-152(A)(9), (11); Ga. Code Ann. §§ 21-2-220(c), -417(c); La. Stat. Ann. § 18:104(B)(5), (8); Mass. Gen. Laws ch. 51, § 47C; Mo. Rev. Stat. § 115.157(1); Mont. Code Ann. § 13-2-110(5)(b)(ii); N.H. Rev. Stat. Ann. § 659:13-b;

registration database information could reveal large swaths of information that voters never intended to share with law enforcement or other federal agencies, potentially chilling their willingness to continue participating in the electoral process.

## II.    THE UNITED STATES' DEMAND FOR UNREDACTED VOTER REGISTRATION DATABASES DOES NOT ENTITLE IT TO EXPEDITED PROCEEDINGS.

In most (but not all) of the United States' lawsuits demanding States' unredacted voter registration databases, it has sought to expedite proceedings, and thus to avoid scrutiny of its unprecedented demands, by filing motions to show cause or to compel production of the States' databases under Title III of the Civil Rights Act.  (*See, e.g.*, ECF 2.[7])  In other words, the United States has filed a complaint seeking relief that could normally be obtained only after first testing the legal sufficiency of its claims, and then only after discovery, summary judgment proceedings,

---

N.J. Stat. Ann. § 19:31-6.4; N.Y. Elec. Law § 8-303(3)(a)(2); Tenn. Code Ann. § 2-2-116; Wis. Stat. § 6.34(3)(a)(8)-(9).

[7] *See also United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal.) (request for order to produce records filed Dec. 1, 2025); *United States v. Griswold*, No. 1:25-cv-03967 (D. Colo.) (motion to compel filed Dec. 11, 2025); *United States v. Thomas*, No. 3:26 cv 00021 (D. Conn.) (motion to compel filed Jan. 7, 2026); *United States v. Albence*, No. 1:25-cv-01453 (D. Del.) (motion for production filed Dec. 2, 2025); *United States v. Evans*, No. 1:25-cv-04403 (D.D.C.) (motion to compel filed Dec. 18, 2025); *United States v. Raffensperger*, No. 1:25-cv-00548 (M.D. Ga.) (motion to compel filed Dec. 18, 2025); *United States v. Matthews*, No. 3:25-cv-03398 (C.D. Ill.) (motion to compel filed Dec. 19, 2025); *United States v. Nago*, No. 1:25-cv-00522 (D. Haw.) (motion to compel filed Dec. 11, 2025); *United States v. Bellows*, No. 1:25- cv-00468 (D. Me.) (motion for order to show cause filed Sept. 18, 2025); *United States v. Demarinis*, No. 1:25-cv-03934 (D. Md.) (motion to compel filed Dec. 1, 2025); *United States v. Galvin*, No. 1:25-cv13816 (D. Mass.) (motion to compel filed Dec. 12, 2025); *United States v. Simon*, 0:25-cv-03761 (D. Minn.) (motion to compel filed Dec. 23, 2025); *United States v. Aguilar*, No. 3:25-cv-00728 (D. Nev.) (motion to compel filed Dec. 11, 2025); *United States v. Oliver*, No. 1:25-cv-01193 (D.N.M.) (motion to compel filed Dec. 2, 2025); *United States v. Board of Elections of the State of N.Y.*, No. 1:25-cv-01338 (N.D.N.Y.) (cross-motion to compel filed Jan. 6, 2026); *United States v. Amore*, No. 1:25-cv-00639 (D.R.I.) (motion to compel filed Dec. 2, 2025); *United States v. Hanzas*, No. 2:25-cv-00903 (D. Vt.) (motion to compel filed Dec. 1, 2025); *United States v. Hobbs*, No. 3:25-cv-06078 (W.D. Wash.) (motion to compel filed Dec. 2, 2025); *United States v. Wisconsin Elections Comm'n*, 3:25-cv-01036 (W.D. Wis.) (motion to compel filed Dec. 18, 2025).

9

and potentially a trial.  The United States' approach is contrary to the Federal Rules of Civil Procedure and finds no support in the Civil Rights Act or relevant case law.[8]

There is only one form of action: a "civil action."  Fed. R. Civ. P. 2.  It "is commenced by filing a complaint with the court," Fed. R. Civ. P. 3, and, with limited exceptions inapplicable here,[9] its conduct is governed by the Federal Rules of Civil Procedure, Fed. R. Civ. P. 1; *see Hannah v. Plumer*, 380 U.S. 460, 465 (observing that a court must adhere to the Federal Rules of Civil Procedure).  A complainant may seek preliminary relief from a court as authorized by the Federal Rules. *See* Fed. R. Civ. Pro. R. 64 (permitting seizure of a person or property "[a]t the commencement of and through an action"); *see also* Fed. R. Civ. Pro. R. 65 (providing for temporary restraining orders and preliminary injunctions).  The Federal Rules make no provision for immediate summary disposition that extinguishes a party's right to challenge a demand. *See Donaldson v. United States*, 400 U.S. 517, 529 (1971) (explaining that even a summary enforcement proceeding requires that "the rights of the party summoned are protected and an adversary hearing, if requested, is made available").

Here, when the United States filed this action, it did not request emergency injunctive relief or claim any urgency to its demand.  But it now seeks immediate summary disposition of its claim without regard for the minimum basic procedures required, such as an opportunity to challenge

---

[8] Given that the government's claims fail as a matter of law, *see* Order, *United States v. Weber*, ___ F. Supp. 3d ___, No. 2:25-cv-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) (granting motions to dismiss and denying motion to compel), the Court may grant the District of Columbia's motion to dismiss without any discovery. The same is not true of the United States' motion to compel, for *granting* affirmative relief would require resolution of significant, contested factual matters.

[9] Federal Rule of Civil Procedure 81 lists the proceedings in which the Federal Rules are either supplanted or supplemented by other, statutorily provided procedures.  A proceeding under Title III of the Civil Rights Act for election records is not one of those proceedings.

the demand, obtain discovery where appropriate, and seek an adversarial hearing.  Again, the Federal Rules make no provision for immediate summary disposition.  And there is no basis under the Rules to give unique treatment to the United States' attempts to compel disclosure of States' and the District of Columbia's voter registration databases.

Instead, the United States attempts to use the Civil Rights Act itself to justify its request for immediate summary disposition.  But nothing in the Act suggests an intent to depart from the Federal Rules.  As the California court held in dismissing the United States' claims and denying its motion to compel, "Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause." *Weber*, 2026 WL 118807, at *8.  The Civil Rights Act simply states that where an election officer does not comply with a Civil Rights Act demand made by the Department of Justice, the Department can seek a district court's intervention.  More specifically, it provides that certain districts "shall have jurisdiction *by appropriate process* to compel the production of such record or paper."  52 U.S.C. § 20705 (emphasis added).[10]  That jurisdictional provision does not authorize courts to abandon the Federal Rules and grant the United States immediate relief without examining the propriety of its demands.  To the contrary, it requires district courts to proceed "by appropriate process"—i.e., by adhering to the Federal Rules.

Finding no support in the text of the Civil Rights Act itself, the United States has repeatedly relied on *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), in support of its position.  *Lynd* addressed "the proper disposition of a Title III proceeding" to compel election records.  306 F.2d at 224.  With little consideration of the statutory language, the Fifth Circuit held that Title III created

---

[10] "The United States district court for the district in which a demand is made" under 52 U.S.C. § 20703 "or in which a record of paper so demanded is located" has jurisdiction over the action described.  52 U.S.C. § 20705.

11

a "special statutory proceeding" devoid of any formal pleading or adversarial factfinding. *Id.* at 225-26.

To the extent that *Lynd* suggests that a "special statutory proceeding" circumventing normal procedures may be appropriate in a case like this one, any such notion has been undermined by subsequent decisions of the Supreme Court. Just two years after *Lynd*, the Supreme Court decided *United States v. Powell*, 379 U.S. 48 (1964), which concerned judicial enforcement of an Internal Revenue Service administrative summons; that summons was issued under the authority of federal statutes, 26 U.S.C. §§ 7402(b) and 7604(a), containing language nearly identical to the Civil Rights Act's provision for a district court's "jurisdiction by appropriate process to compel" the production of records. *Powell*, 379 U.S. at 51-52 & n.10. *Powell* explained that where a statute "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *Id.* at 58 n.18; *see also* Fed. R. Civ. P. 1, 81. It thus rejected the central premise of *Lynd*.

The United States therefore is wrong to assert that the Civil Rights Act authorizes courts to summarily order States or the District of Columbia to provide their unredacted voter registration databases. Instead, adjudicating the legal sufficiency of the United States' claim through motions to dismiss is the appropriate and lawful initial procedure. If the claim avoids dismissal, the case should then proceed to discovery, so that the District of Columbia and the Court can fairly evaluate the propriety of the United States' demand and its intended use of the voter registration database. *See* Fed. R. Civ. P. 16.

That is exactly the course that *Powell* prescribed for analogous circumstances. *Powell* held that a "taxpayer may challenge the summons on any appropriate ground," and that the Commissioner of Internal Revenue "must show that the investigation will be conducted pursuant

12

to a legitimate purpose" and that "the inquiry may be relevant to the purpose." 379 U.S. at 57-58. *Powell* emphasized that courts may "inquire into the underlying reasons for the examination" of the sought-after records because "a court may not permit its process to be abused." *Id.* at 58. Such abuse takes place where—as the California court found in dismissing the United States' case—a demand has been made for an "improper purpose . . . or for any other purpose reflecting on the good faith of the particular investigation." *Id.*; *see United States v. Clarke*, 573 U.S. 248, 254-55 (2014) (reaffirming that a summoned party "may present argument and evidence on all matters bearing on a summons's validity" and that circumstantial evidence can "give rise to a plausible inference of improper motive"). The United States has provided no reason for the Court to take a different approach here.

## III. THE CIVIL RIGHTS ACT DOES NOT PERMIT THE FEDERAL GOVERNMENT TO DEMAND UNREDACTED VOTER REGISTRATION DATABASES.

The United States cites one federal law as authority for its voter database requests: the Civil Rights Act of 1960. (ECF 1 ¶¶ 31-33.) The law, however, does not overcome the States' broad authority to decide the status of their own voter data, and does not require producing that sensitive personal data in response to the Department of Justice's sweeping demands.

### A. States Have Primary Authority over Elections, and the Department of Justice's Demands Are Unconstitutional Because They Exceed the Scope of Authorizing Statutes.

State legislatures have primary authority to decide the time, place, and manner of federal elections, subject to displacement only by Congress. U.S. Const. art. I, § 4. States' discretion to set election procedures is broad. *See, e.g.*, *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986); *United States v. Classic*, 313 U.S. 299, 311 (1941). The Constitution allows States "to provide a complete code for congressional elections." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). States' authority encompasses setting procedures for voter registration, maintaining voter

13

rolls, and protecting voter data. *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 774 (2018); *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013); *Smiley*, 285 U.S. at 366.

Collecting voter information implicates significant privacy interests. *See, e.g.*, *Public Int. Legal Found. v. Bellows*, 92 F.4th 36, 55 (1st Cir. 2024); *Public Int. Legal Found. v. North Carolina State Bd. of Elections*, 996 F.3d 257, 266-67 (4th Cir. 2021); *Moore v. Kobach*, 359 F. Supp. 3d 1029, 1049-50 (D. Kan. 2019); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1345 (N.D. Ga. 2016); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 735 (S.D. Miss. 2013). Accordingly, States have exercised their broad powers to protect that information. States vary in their approaches, reflecting State legislatures' differing policy decisions. Most States, however, limit what data is public, who can access data, or how data may be used.[11]

The United States' demand for voter data runs roughshod over States' prerogative to set these limits. The President has no authority to displace States' election laws; only Congress may

---

[11] Ala. Code § 17-3-53; Alaska Stat. § 15.07.195; Ariz. Rev. Stat. Ann. §§ 16-153, -168(E); Cal. Election Code §§ 2166(b)(2), 2194(a)(2)-(3), (b)(1); Colo. Rev. Stat. § 1-2-302(8); Conn. Gen. Stat. § 9-23h; Del. Code Ann. tit. 15, § 1305; D.C. Mun. Regs. tit. 3, § 510.5; Fla. Stat. § 97.0585; Ga. Code Ann. § 21-2-225(c); Haw. Rev. Stat. §§ 11-14, -97(a); Idaho Code §§ 34-437(1), -437A(3); 10 Ill. Rev. Stat. 5A/1A-25; Ind. Code §§ 3-7-26.4-8, -6, -10; Iowa Code §§ 48A.38(1)(f), .39; Kan. Stat. Ann. §§ 25-2320(b), 2320a; Ky. Rev. Stat. Ann. § 116.095, 117.025(3)(i); La. Stat. Ann. § 18:154(C); Mass. Gen. Laws ch. 51, § 47C; Me. Stat. tit. 21-A, § 96A(1)(K)(2), (6); Md. Code Ann., Elec. Law § 3-506(a)(1); Md. Code Regs. 33.05.02.02(B)(4); Mich. Comp. Laws § 169.168.509gg; Minn. Stat. § 201.091, subds. 4(c), 5, 9; 1 Miss. Code R. pt. 10, R. 7.2; Mo. Rev. Stat. § 115.157(3); Mont. Code Ann. § 13-2-122(1); Mont. Admin. R. 44.3.1102(3); Neb. Rev. Stat. § 32-330(3)(b), (4); Nev. Rev. Stat. §§ 293.440(6), .558(2); N.H. Rev. Stat. Ann. §§ 654:31(VI), :31-a; N.J. Stat. Ann. § 19:31-18.1(c); N.M. Stat. Ann. § 1-4-5.4(C), -5.5(B); N.Y. Elec. Law § 3-103(5); N.C. Gen. Stat. § 163-82.10(a1); N.D. Cent. Code § 16.1-02-15; Ohio Rev. Code Ann. § 3503.13(A)(2); Okla. Stat. tit. 26, §§ 4-112(H), 7-103.2(B)(1), (3); Or. Rev. Stat. § 247.948(2), .955; 25 Pa. Cons. Stat. § 1404(b)(3); 17 R.I. Gen. Laws § 17-9.1-21; S.C. Code Ann. § 7-5-170(1); S.D. Codified Laws § 12-4-9; Tenn. Code Ann. § 2-2-127, -138; Tex. Elec. Code Ann. § 18.009; Utah Code Ann. § 20A-2-104(4)(c), (d); Vt. Stat. Ann. tit. 17, § 2154(b)(1), (c)(1); Va. Code Ann. § 24.2-407, -407.1; Wash. Rev. Code § 29A.08.710(2)(a), .720(3)(a); W. Va. Code 3-2-30(a), (f); Wis. Stat. § 6.36(1)(b)(1)(a); Wyo. Stat. Ann. 22-2-113(a), (d).

do so.  U.S. Const. art. I, § 4.  Thus, anything the President purports to do by executive order cannot override States' protections on voter data.  *See also California v. Trump*, 786 F. Supp. 3d 359, 373 (D. Mass. 2025); *League of United Am. Citizens v. Executive Off. of the President*, 780 F. Supp. 3d 135, 159 (D.D.C. 2025) (observing that "Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds").  Because Congress has not authorized the federal government to make the sweeping requests it has made here, the demands are unconstitutional.

**B.      The Civil Rights Act of 1960 Does Not Authorize the Department of Justice's Demands for Voter Registration Data Unrelated to Civil Rights Violations.**

The record-inspection authority conferred by the Civil Rights Act of 1960, 52 U.S.C. § 20703, likewise does not support the Department of Justice's present demands.  Congress created this inspection authority to enable the federal government to investigate and remediate racially discriminatory voting practices.  The Department of Justice's present demands for records do not even purport to serve that objective.

The history of the record-inspection provision confirms its limited purpose.  Significant opposition to sweeping civil rights legislation meant that the Civil Rights Act's voting protections were achieved incrementally, through years of revisions and expansions.  The first round of legislation, adopted in 1957, did not yet require States to maintain voter registration records or make them available for inspection, but it created the bipartisan Commission on Civil Rights.  Civil Rights Act of 1957, § 101(a), Pub. L. No. 85-315, 71 Stat. 634 (Sept. 9, 1957).  The Commission's first report, issued in 1959, included over 120 pages of findings and recommendations on voting discrimination.  *Report of the United States Commission on Civil Rights* (Sept. 9, 1959), https://tinyurl.com/y253324x.  The Commission understood discrimination to be a central reason for its creation, writing that "[t]he primary concern of Congress in passing the Civil Rights Act of

15

1957, and the single specific field of study and investigation that it made mandatory for this Commission, was alleged denials of the right to vote." *Id.* at 40.

In the report, the Commission repeatedly bemoaned that its core purposes had often been thwarted by States' failure to retain or produce rejected voting applications and other registration records. *See, e.g.*, *id.* at 93 ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible."); *id.* at 137 (explaining that midway through the Commission's review of Alabama counties' records, the state legislature authorized counties to destroy denied registrants' application forms even though the forms were "essential to any investigation of denials of the right to vote").  Even where responsive records had not been destroyed, the Commission described occasions on which States had denied the Commission access.  *See id.* at 70 (recounting that "when the Commission's agents arrived at the courthouse . . . the Board of Registrars told them that, by order of [Alabama] Attorney General Patterson, the records would not be made available to the Commission on Civil Rights"); *see also id.* at 98 (describing Louisiana's refusal to permit inspection of voter records).

In light of these hurdles and other findings, the Commission recommended that Congress require States to preserve and retain all registration and voting records so they could be inspected. *Id.* at 138.   And the Commission was not the only advocate for such a requirement.  President Eisenhower urged Congress to adopt these provisions to strengthen the federal response to racially discriminatory voting practices and to counter States' efforts at obstruction:

> A serious obstacle has developed which minimizes the effectiveness of [the Civil Rights Act of 1957].  Access to registration records is essential to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination.   But during preliminary investigations of complaints the Department of Justice, unlike the Civil Rights Commission, has no authority to require the production of election records in a civil proceeding.  State or local authorities, in some instances, have refused to permit the inspection of their

16

election records in the course of investigations.  Supplemental legislation, therefore, is needed.

*Selected Speeches of Dwight D. Eisenhower,* 91 Cong. Rec 2d, Vol. 2-3, https://perma.cc/5KCX-3JT4, at 145.  Similarly, as Congress considered the legislation that would become the Civil Rights Act of 1960, Representative Emanuel Celler remarked that inspection mechanisms were needed to prevent discriminatory application of voter qualification rules.  *See* 86 Cong. Rec. 5450 (1960), https://tinyurl.com/yrya3xpb.

It was against this backdrop that, in 1960, Congress required States to preserve all voter registration records and make them available to the Attorney General for inspection.  After gaining this authority, the Commission on Civil Rights and the Department of Justice wielded that power in precisely the way Congress intended: gathering evidence to investigate complaints of racially discriminatory practices, evaluating whether there were patterns or practices disenfranchising Black voters, and seeking legal remedies in the federal courts where negotiations with voting officials were ineffective.  *See generally Report of United States Commission on Civil Rights* (Sept. 30, 1963), https://tinyurl.com/58v3a84u (detailing investigations, negotiations, and lawsuits initiated by the Department of Justice based on the 1957 and 1960 Civil Rights Acts.)

Here, by contrast, the Department does not claim any civil rights-related purpose for its demands for voter registration records.  Instead, it has claimed that it is entitled to inspect registration records to determine compliance with the NVRA and HAVA—statutes that did not exist when Congress enacted the Civil Rights Act's record retention provisions.  Inspection for this purpose is unauthorized by statute.

## CONCLUSION

The motions to dismiss should be granted.

17

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Virginia A. Williamson

_____
VIRGINIA A. WILLIAMSON (Bar No. D00525)
Assistant Attorney General
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland  21202
vwilliamson@oag.maryland.gov
(410) 576-6584

Attorneys for Amicus Curiae
State of Maryland


KRISTIN K. MAYES
Attorney General of Arizona

2005 N. Central Avenue
Phoenix, AZ 85004


ROB BONTA
Attorney General of California

1300 I Street, Suite 125
Sacramento, CA 95814


PHILIP J. WEISER
Attorney General of Colorado

Office of the Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203


WILLIAM TONG
Attorney General of Connecticut

165 Capitol Avenue
Hartford, CT 06106


KATHLEEN JENNINGS
Attorney General of Delaware

Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801


ANNE E. LOPEZ
Attorney General of Hawai'i

Department of the Attorney General
425 Queen Street
Honolulu, Hawai'i 96813

18

AARON M. FREY
Attorney General of Maine

6 State House Station
Augusta, ME 04333


KEITH ELLISON
Attorney General of Minnesota

445 Minnesota Street
St. Paul, Minnesota, 55101


JENNIFER DAVENPORT
Acting Attorney General of New Jersey

Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625


LETITIA JAMES
Attorney General of New York

28 Liberty St.
New York, NY 10005


DAN RAYFIELD
Attorney General of Oregon

1162 Court Street NE
Salem, OR 97301


NICHOLAS W. BROWN
Attorney General of Washington

1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100

DANA NESSEL
Attorney General of Michigan

P.O. Box 30212
Lansing, Michigan 48909


AARON D. FORD
Attorney General of Nevada

100 North Carson Street
Carson City, NV 89701


RAÚL TORREZ
Attorney General of New Mexico

New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501


PETER F. NERONHA
Attorney General of Rhode Island

150 South Main Street
Providence, RI 02903


CHARITY R. CLARK
Attorney General of Vermont

109 State Street
Montpelier, VT 05609

19