**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>          *Plaintiff*,<br><br>  v.<br><br>DISTRICT OF COLUMBIA BOARD OF ELECTIONS; MONICA H. EVANS, in her official capacity as Executive Director for the District of Columbia Board of Elections; GARY THOMPSON, in his official capacity for the District of Columbia Board of Elections as Chair and Member; and KARYN GREENFIELD, in her official capacity for the District of Columbia Board of Elections as Member,<br><br>          *Defendants*. | Civil Action No. 25-4403 (RDM) |

**[PROPOSED] JOINT MOTION TO DISMISS AND OPPOSITION TO MOTION TO COMPEL OF PROPOSED INTERVENORS COMMON CAUSE, RUTH GOLDMAN, AND CHRIS MELODY FIELDS**

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................................ii

TABLE OF AUTHORITIES..........................................................................................................iii

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 2

    I.    The United States Seeks to Force the Disclosure of Sensitive Voter Data. ....................... 2

    II.   The United States Seeks to Unlawfully Construct a National Voter Database with the Data................................................................................................................................... 4

    III.  The United States Seeks to Unlawfully Use the Data to Disenfranchise Voters................. 7

LEGAL STANDARD................................................................................................................... 10

ARGUMENT............................................................................................................................... 10

    I.    The United States Is Not Entitled to Summary Proceedings For its Data Request........... 10

    II.   The Complaint Fails to State a Claim Under Title III, Because It Does Not Adequately Plead That DOJ Has Provided a Written Statement of Its Basis and Its Purpose. ............ 16

        A.   DOJ's Statement of the Basis and the Purpose for its Requests is Inadequate. ............. 16

        B.   DOJ's Statement of the Basis and the Purpose for its Request is Pretextual. ................ 20

    III.  Nothing in Title III Entitles DOJ to Unredacted Records. ............................................... 22

CONCLUSION............................................................................................................................ 25

CERTIFICATE OF SERVICE ..................................................................................................... 26

**TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................... 10

*Becker v. United States*,
    451 U.S. 1306 (1981)................................................................................................... 12

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................... 17

*Consumer Financial Protection Bureau v. Accrediting Council for Independent Colleges and Schools*,
    854 F.3d 683 (D.C. Cir. 2017)..................................................................................... 19

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
    603 U.S. 799 (2024)..................................................................................................... 20

*Donaldson v. United States*,
    400 U.S. 517 (1971)..................................................................................................... 12

*In re Coleman*,
    208 F. Supp. 199 (S.D. Miss. 1962)...................................................................... 13, 24

*Judicial Watch, Inc. v. United States Secret Service*,
    726 F.3d 208 (D.C. Cir. 2013)..................................................................................... 23

*Kaempe v. Myers*,
    367 F.3d 958 (D.C. Cir. 2004).................................................................................. 8, 10

*Kennedy v. Lynd*,
    306 F.2d 222 (5th Cir. 1962) ................................................................................. passim

*Niz-Chavez v. Garland*,
    593 U.S. 155 (2021)..................................................................................................... 20

*Project Vote/Voting for America, Inc. v. Long*,
    682 F.3d 331 (4th Cir. 2012) ...................................................................................... 24

*Public Interest Legal Foundation v. Benson*,
    136 F.4th 613 (6th Cir. 2025) ..................................................................................... 18

*Public Interest Legal Foundation, Inc. v. Bellows*,
    92 F.4th 36 (1st Cir. 2024)...................................................................................... 23, 24

*Public Interest Legal Foundation, Inc. v. Dahlstrom*,
    673 F. Supp. 3d 1004 (D. Alaska 2023) ..................................................................... 24

*Public Interest Legal Foundation, Inc. v. Matthews*,
  589 F. Supp. 3d 932 (C.D. Ill. 2022) ................................................................. 24

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
  996 F.3d 257 (4th Cir. 2021) .............................................................................. 24

*Sheetz v. County of El Dorado*,
  601 U.S. 267 (2024)............................................................................................ 25

*State of Alabama ex rel. Gallion v. Rogers*,
  187 F. Supp. 848 (M.D. Ala. 1960) ...................................................................... 1

*Tincher v. Noem*,
  No. 25-cv-4669 (D. Minn. Jan. 16, 2026)........................................................... 10

*United States v. Aero Mayflower Transit Co., Inc.*,
  831 F.2d 1142 (D.C. Cir. 1987)........................................................................... 19

*United States v. Benson*,
  No. 1:25-cv-1148-HYJ-PJG (W.D. Mich. Feb. 10, 2026)...................................... 2

*United States v. Kentucky*,
  No. 3:17-cv-00094 (E.D. Ky. June 21, 2018)...................................................... 20

*United States v. Oregon*,
  No. 6:25-cv-1666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026)................................ passim

*United States v. Powell*,
  379 U.S. 48 (1964)................................................................................. 12, 13, 19

*United States v. Weber*,
  No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026)................. passim

**Statutes**

5 U.S.C. § 552a........................................................................................................... 21

26 U.S.C. § 7604........................................................................................................ 12

52 U.S.C. § 10101...................................................................................................... 14

52 U.S.C. § 20501.................................................................................................... 1, 8

52 U.S.C. § 20502...................................................................................................... 18

52 U.S.C. § 20507................................................................................................ passim

52 U.S.C. § 20701.................................................................................................. 1, 16

52 U.S.C. § 20703 .......................................................................................... 2, 16, 17, 23

52 U.S.C. § 20705 ............................................................................................ 11, 12, 13

52 U.S.C. § 20901 .......................................................................................................... 1

52 U.S.C. § 21083 ................................................................................................. 8, 18, 21

52 U.S.C. § 21085 ................................................................................................. 8, 18, 21

Driver's Privacy Protection Act of 1994,
    Public Law No. 103-322, 108 Stat. 1796 (1994), codified at 18 U.S.C. § 2721 *et seq* .......... 14

E-Government Act of 2002,
    Public Law No. 107-347, 116 Stat. 2899 (2002) ................................................... 14

Federal Information Security Modernization Act of 2014,
    Public Law No. 113-283, 128 Stat. 3073 (2014), codified at 44 U.S.C. §§ 3351 *et seq.*
    (2014) ......................................................................................................... 14

Privacy Act of 1974,
    Public Law No. 93-579, 88 Stat. 1896 (1974) ........................................................... 14

## Rules

Fed. R. Civ. P. 1 .......................................................................................................... 11

Fed. R. Civ. P. 12(b) ................................................................................................ 10, 11

Fed. R. Civ. P. 81 .................................................................................................... 11, 12

## Other Authorities

"Federal Judicial Circuits: Fifth Circuit," FEDERAL JUDICIAL CENTER,
    https://perma.cc/9MSD-EFRB (last visited Dec. 9, 2025) ................................... 14

Alexandra Berzon & Nick Corasaniti,
    *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, NEW YORK
    TIMES, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-
    election-deniers-voting-security.html ............................................................ 6

Andy Kroll & Nick Surgey,
    *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the
    Election and Change the Country*, PROPUBLICA, July 13, 2024,
    https://perma.cc/5W2N-SS2Q ...................................................................... 6

December 5, 2025 Post by @AAGDhillon,
    https://x.com/AAGDhillon/status/1997003629442519114 ................................... 5

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html ........ 4, 5

Doug Bock Clark,
*She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6 .............. 6

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times Magazine, Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html ........................................................................................ 5

House of Representatives, Report No. 86-956 (1959) .................................................... 1

Jen Fifield,
*Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PENNSYLVANIA CAPITAL-STAR, Aug. 27, 2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post ........................................................................ 6

Jonathan Shorman,
*DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security .......................................................................................................... 5

Jonathan Shorman,
*Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds as Ineligible*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/ ........................ 9

Jude Joffe-Block & Miles Parks,
*The Trump Administration Is Building a National Citizenship Data System*, NATIONAL PUBLIC RADIO, June 29, 2025, https://perma.cc/J8VZ-X4N4 ................................ 6

Jude Joffe-Block,
*Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://perma.cc/6PY2-3F3D ........................................................ 5

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Center for Justice (updated Mar. 4, 2026), https://perma.cc/M6QS-THRS ........................................................................ 2

Kyle Cheney,
*Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245 ........................................................................ 7

Matt Cohen,
*DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*,
DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters .......................................................................................................................... 6

Miles Parks & Jude Joffe-Block,
*Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR (May 22, 2025), https://perma.cc/X3Q6-AFJU ................................................................. 5

Press Release, United States Department of Justice,
*Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026), https://perma.cc/6QP2-8ZXC ..................................................... 4

Press Release, United States Department of Justice,
*Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026), https://perma.cc/3L8Q-SJM5 .......................................................................... 4

Press Release, United States Department of Justice, *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* (Feb. 26, 2026), https://perma.cc/67UZ-KJFY ........................................................................................ 4

Press Release, United States Department of Justice, *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/TQ5T-FB2A ................................................. 4

Press Release, United States Department of Justice, *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/HHJ7-JWQQ ............. 4

Press Release, United States Department of Justice, *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC ...................................................................................... 4

Press Release, United States Department of Justice, *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD ................................................................................... 4

Press Release, United States Department of Justice, *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA ...................................................................................... 4

Press Release, United States Department of Justice, *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018) https://perma.cc/G2EZUUA5 .................................... 20

*Read Bondi's Letter to Minnesota's Governor*, NEW YORK TIMES (Jan. 24, 2026), https://www.nytimes.com/interactive/2026/01/24/us/pam-bondi-walz-doc.html .................. 10

Reid Epstein & Nick Corasaniti,
*Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*,
NEW YORK TIMES, February 2, 2026,
https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html ............... 7

Sarah Lynch,
*US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes,
Documents Show*, REUTERS, Sept. 9, 2025,
https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-
voter-roll-data-criminal-probes-documents-2025-09-09 .......................................................... 5

Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976) ....................... 14

United States Department of Justice, Civil Rights Division,
*Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021),
https://perma.cc/74CP-58EH .................................................................................................... 1

**INTRODUCTION**

In this action—one of dozens filed across the country—the United States seeks to compel the disclosure of voters' sensitive personal voter data to which it is not entitled, using the civil rights laws as a pretext. Because the United States failed to disclose the basis and purpose of its request for the data, dismissal should be granted, and the United States' attempt to summarily dispose of this case via an improper motion to compel should be rejected.

Congress has repeatedly legislated to protect the franchise, including through Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701 *et seq.*, as well as the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq*. The purpose of these statutes is to ensure that all eligible Americans—especially racial minorities and voters with disabilities—can participate in free, fair, and secure elections. As the U.S. Department of Justice ("DOJ") has explained, Title III of the CRA, the election records provision invoked in the Complaint here, was designed to "secure a more effective protection of the right to vote." U.S. Dep't of Just., Civ. Rts. Div., *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021), https://perma.cc/74CP-58EH (citing *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), and H.R. Rep. No. 86-956 (1959)).

The federal government's demand for the District of Columbia ("D.C.")'s unredacted voter file—which contains sensitive personal information including driver's license numbers and partial Social Security numbers from hundreds of thousands of D.C. residents—violates the CRA and undermines its core purposes of protecting voting access. Releasing unredacted voter records for purposes unrelated to voter access would deter voter participation and undermine the right to vote. That is especially true here: the government's actual purpose—widely reported but never disclosed

1

its request—is to build an unauthorized and unlawful national voter database to illegally target and challenge voters.

The Complaint does not adequately plead that the United States has met the requirements of the CRA, which mandates the government fully and accurately set forth "the basis and the purpose" for its data request, 52 U.S.C. § 20703. District courts in California and Oregon recently reached this exact conclusion with respect to materially identical complaints seeking those states' complete voter files, dismissing the United States' claims without leave to replead. *See United States v. Weber*, No. 2:25-cv-9149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 6:25-cv-1666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026); *see also United States v. Benson*, No. 1:25-cv-1148-HYJ-PJG, 2026 WL 362789  (W.D. Mich. Feb. 10, 2026) (dismissing CRA claims on other grounds). This Court should do the same.

## BACKGROUND

**I.      The United States Seeks to Force the Disclosure of Sensitive Voter Data.**

Beginning in May 2025, DOJ began sending letters to election officials in at least forty states, making escalating demands for the production of voter registration databases, with plans to gather data from all fifty states and the District of Columbia. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Mar. 4, 2026), https://perma.cc/M6QS-THRS.

On July 11, 2025, DOJ sent a letter to the Executive Director of the District of Columbia Board of Elections, Monica H. Evans ("Director Evans"), demanding within 14 days an electronic copy of D.C.'s entire statewide voter registration list, including "all fields." Dkt. 3-1 at 6 (Compl. ¶ 23); Pl.'s Mot. for Order to Compel, Ex. 1, Ltr. from Michael E. Gates to Monica Evans dated July 11, 2025, ("July 11 Letter"), Dkt. 2-3 at 2, 4. The July 11 Letter also propounded several questions regarding D.C.'s voter registration and list maintenance procedures, and it requested that

D.C. provide information about purported "registered voters identified as ineligible to vote" due to being non-citizens or due to a felony conviction. *Id.* at 3–4.

On August 6, Director Evans provided DOJ a redacted version of the registration list. Dkt. 3-1 at 6 (Compl. ¶ 24); Pl.'s Mot. for Order to Compel, Ex. 2, Ltr. from Monica Evans to Michael E. Gates dated August 6, 2025 ("August 6 Letter"), Dkt. 2-4 at 3. Director Evans confirmed that "no voters were identified or removed due to non-citizenship, felony conviction, or adjudicated mental incompetence." August 6 Letter at 6.

On August 14, DOJ sent another letter, reiterating its demand for the full electronic voter file. Dkt. 3-1 at 6 (Compl. ¶ 25); Pl.'s Mot. for Order to Compel, Ex. 3, Ltr. from Harmeet K. Dhillon to Monica Evans dated August 14, 2025 ("August 14 Letter"), Dkt. 2-5 at 2. DOJ again stated that the production "must contain *all fields*, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." August 14 Letter at 2. This time, DOJ also cited the Civil Rights Act of 1960 ("CRA") as authority for its request, and it noted that the "purpose of the request is to ascertain District of Columbia's compliance with the list maintenance requirements of the [National Voter Registration Act ("NVRA")] and [Help America Vote Act ("HAVA")]." *Id.* at 3.

On September 4, 2025, Director Evans sent a letter to DOJ refusing to provide an unredacted voter registration list. Dkt. 3-1 at 7 (Compl. ¶ 29); Pl.'s Mot. for Order to Compel, Ex. 4, Ltr. from Monica Evans to Harmeet K. Dhillon dated September 4, 2025 ("September 4 Letter"),

Dkt. 2-6 at 2. The United States responded by filing this lawsuit, which is one of at least thirty similar suits seeking disclosure of sensitive voter data.[1]

## II.    The United States Seeks to Unlawfully Construct a National Voter Database with the Data.

As documented in public reporting, DOJ's requests for sensitive voter data from D.C. and other states appear to be part of a broader effort to construct a national voter database—using untested database matching techniques to scrutinize state voter rolls and, in effect, to "nationalize" elections.

According to this reporting, federal employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.    DOJ    is coordinating these novel efforts with the federal Department of Homeland Security ("DHS"),

---

[1] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* (Feb. 26, 2026), https://perma.cc/67UZ-KJFY; Press Release, U.S. Dep't of Just., *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026), https://perma.cc/3L8Q-SJM5; Press Release, U.S. Dep't of Just., *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026), https://perma.cc/6QP2-8ZXC; Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/HHJ7-JWQQ; Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/TQ5T-FB2A; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

4

according to reported statements from DOJ and DHS. *Id.*[2] One article extensively quoted a lawyer who recently left DOJ's Civil Rights Division, describing the Administration's aims in these cases:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data . . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times Mag., Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

Indeed, publicly-disclosed documents have confirmed that DOJ has asked staffers from the new "Department of Governmental Efficiency" ("DOGE") to identify noncitizens in state voter rolls by matching voter data with data from the Social Security Administration.[3] DOJ officials have since claimed that "we've checked 47.5 million voting records" and found "several thousand non-citizens who are enrolled to vote in Federal elections," although reporting indicates that these efforts are producing false positives—*i.e.*, that they are flagging U.S. citizens as being non-citizens who are ineligible to vote.[4]

---

[2] *See also, e.g.*, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09.

[3] *E.g.*, Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR (May 22, 2025), https://perma.cc/X3Q6-AFJU .

[4] December 5, 2025 Post by @AAGDhillon, https://x.com/AAGDhillon/status/1997003629442519114; Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://perma.cc/6PY2-3F3D.

According to additional public reporting, these efforts are being conducted with the involvement of self-proclaimed election integrity advocates within and outside the government who have previously sought to disenfranchise voters and overturn elections. Those advocates include Heather Honey, who sought to overturn the result of the 2020 presidential election in multiple states and now serves as DHS's "deputy assistant secretary for election integrity."[5] Also involved is Cleta Mitchell, a private attorney and leader of a national group called the "Election Integrity Network," who has, among other things, promoted the use of artificial intelligence to challenge registered voters.[6]

A recent federal court filing by DOJ corroborates how United States officials have been seeking to use voter data in conjunction with data-matching and aggregation techniques, with these outside "election integrity" advocates. As detailed in the filing, which was made on behalf of the U.S. Social Security Administration (SSA):

> SSA determined in its recent review that in March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter

---

[5] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html (documenting "ascent" of election denier Honey); Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR, Aug. 27, 2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6.

[6] *See, e.g.*, Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters; *see also* Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://perma.cc/J8VZ-X4N4 (reporting that Mitchell had received a "full briefing" from federal officials); *see also* Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://perma.cc/5W2N-SS2Q ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrections to the Record at 5, *Am. Fed'n of State, Cnty. & Mun. Emps. v. Soc. Sec. Admin.*, No. 25-cv-596, Dkt. 197 (D. Md. Jan. 16, 2026); *see also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245. The filings, which do not specify the terms of the "Voter Data Agreement" or the activities these DOGE actors or others undertook pursuant to it, also indicated that, around the same period, DOGE actors also shared unknown amounts of social security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." Notice of Corrections to the Record, *supra*, at 6.

The current administration has made clear these efforts' purpose. Last month, President Trump announced his desire to "nationalize" elections in certain states: "The Republicans should say, 'We want to take over,'" he said. "We should take over the voting, the voting in at least many—15 places. The Republicans ought to nationalize the voting." Reid Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026, https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html.

### III. The United States Seeks to Unlawfully Use the Data to Disenfranchise Voters.

Additional federal government documents reveal how that the United States plans to use voters' sensitive personal data: to assert control over voting eligibility, "nationalize" elections, order voter disenfranchisement, and potentially contest election results. As noted in Proposed Common Cause Intervenors' motion to intervene, in connection with its requests for states' voter data, the United States has begun asking states to execute a memorandum of understanding

describing how the data will be used. *See* Ex. 2, U.S. Dep't of Just., Civ. Div., Confidential Mem. of Understanding ("MOU"); *see also* Declaration of Eric Neff in Support of Motion to Compel, *United States v. Raffensperger*, No. 26-cv-485-ELR, Dkt. 31-2, ¶ 21 (N.D. Ga. Feb. 19, 2026) (acknowledging MOU and representing that two states have signed it).[7] The terms of the MOU purports to vest the United States with substantial new authority to identify supposedly ineligible voters on voter rolls and then compel their removal, depriving them of the franchise.

The NVRA and HAVA give states the responsibility of conducting a "reasonable effort" to maintain voter lists and remove ineligible voters. 52 U.S.C. § 20507(a)(4); § 21083(a)(4)(A). The specific procedures for complying with HAVA's centralized voter file requirement are thus "left to the discretion of the State." 52 U.S.C. § 21085. The NVRA also protects voters by requiring that certain potentially ineligible voters remain on the rolls for two election cycles before removal, reducing the risk of erroneously purging ineligible voters. *Id.* § 20507(d)(1)(B). That reflects Congress' core goals with the NVRA: protecting and expanding the right to register to vote and participate in democracy. *E.g.*, 52 U.S.C. § 20501.

The MOU's terms, however, purport to vest authority to identify ineligible voters in the hands of the federal government. MOU at 3, 6. The MOU makes DOJ a "Custodian" of the state's voter file and requires DOJ to analyze that file and identify "any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns," bearing on whether the list "only includes eligible voters." *Id.* at 5–6. Once federal officials flag voters as ineligible, states would be required to remove them "within forty-five (45) days" and resubmit their voter lists for further review. *Id.* at 6. These removals would be required regardless of the NVRA's procedural

---

[7] An endorsed version of the MOU, bearing DOJ's signature, is attached to this motion as Exhibit 2. This Court may take judicial notice of the MOU as a public record. *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

protections—including its firm prohibition on systematic voter removals within 90 days of an election, 52 U.S.C. § 20507.[8]

DOJ's actions also indicate that it may target specific groups of voters in its use of the requested data. In its initial July 11 Letter to Director Evans, and in letters to other states, DOJ requested information about how election officials, among other things, identify and remove registered voters who are ineligible to vote, such as due to a felony conviction or lack of citizenship. *See* July 11 Letter at 3.[9] Many of these same voters are uniquely vulnerable to being wrongly removed from the voter rolls based on imperfect data matching systems, including naturalized citizens (who may have indicated they were not a citizen on a government form prior to naturalization) and voters with felony convictions (who may have been previously ineligible to vote before having their rights restored).

In short, extensive public reporting, court filings, and DOJ officials' statements and admissions indicate that the United States' aim in seeking sensitive voter data is to turn states' voter rolls into a tool to unlawfully and improperly mass-challenge voters and interfere with states' democratic processes.

---

[8] *See also* Jonathan Shorman, *Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds as Ineligible*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/.

[9] *See also, e.g.*, Br. in Supp. of Mot. to Intervene as Defs., Exhibit No. 1, Letter from Maureen Riordan to Sec'y of State Al Schmidt (June 23, 2025), *United States v. Pennsylvania*, No. 2:25-cv-1481-CB (W.D. Pa. Oct. 9, 2025), Dkt. 37-1 (Pennsylvania); Mot. for Leave to File Mot. to Dismiss, Exhibit A, Letter from Michael E. Gates to Sec'y of State Jocelyn Benson (July 21, 2025), *United States v. Benson*, No. 1:25-cv-1148-HYJ-PJG (W.D. Mich. Nov. 25, 2025), Dkt. 34-3 (Michigan); Decl. of Thomas H. Castelli in Supp. of State Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Tobias Read (July 16, 2025), *United States v. Oregon*, No. 6:25-cv-1666-MTK (D. Or. Nov. 17, 2025), Dkt. 33-1 (Oregon); Decl. of Malcolm A. Brudigam in Supp. of Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Shirley Weber (July 10, 2025), *United States v. Weber*, No. 2:25-cv-9149 (C.D. Cal. Nov. 7, 2025), Dkt. 37-2 (California).

Recent events have further highlighted the abnormal nature of the United States' request. On January 24, 2026, Attorney General Pamela Bondi wrote a letter to Minnesota Governor Tim Walz, regarding DHS's "Operation Metro Surge" in the Twin Cities.[10] Like D.C., Minnesota has been sued by the federal government for access to its unredacted voter rolls. The letter lists three actions Minnesota must take to "restore the rule of law, support ICE officers, and bring an end to the chaos"—one being to "allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960."[11]

## LEGAL STANDARD

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, it does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court need not accept a complaint's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nor can "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," survive a motion to dismiss. *Id*. at 678–79. In assessing a complaint, a court may consider "public records subject to judicial notice." *Kaempe*, 367 F.3d at 965.

## ARGUMENT

I.    **The United States Is Not Entitled to Summary Proceedings For its Data Request.**

In its motion to compel, the United States claims that its request is not subject to meaningful procedural safeguards, in particular scrutiny under Federal Rule of Civil Procedure 12. It asserts

---

[10]    *Read Bondi's Letter to Minnesota's Governor*, N.Y. TIMES (Jan. 24, 2026), https://www.nytimes.com/interactive/2026/01/24/us/pam-bondi-walz-doc.html ("Bondi Letter"); *see also* Order, *Tincher v. Noem*, No. 25-cv-4669 (D. Minn. Jan. 16, 2026), Dkt. 85 (granting injunction against certain DHS practices towards the civilian population of Minneapolis-St. Paul in connection with purported immigration enforcement operations there).

[11] Bondi Letter at 2–3.

that Title III universally "displaces the Federal Rules of Civil Procedure by creating a 'special statutory proceeding'" where "'[a]ll that is required is a simple statement by the Attorney General[,]'" made after "a written demand for Federal election records and papers covered by the statute, explaining that the person against whom an order is sought has failed or refused to make the requested records" available. Mot. to Compel Br. at 5 (citations omitted); *see also* Dkt. 3-1 at 2–3 (Compl. ¶¶ 1–4).

The CRA says nothing of the sort, and binding precedent and the Federal Rules are to the contrary. "Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause." *Weber*, 2026 WL 118807, at *8; *accord Oregon*, 2026 WL 318402, at *8 ("There is no current or binding authority for the proposition that Title III precludes the Court from evaluating the sufficiency of Plaintiff's allegations regarding Defendants' alleged failure to comply with Title III, including whether— applying Rule 12(b)(6) standards—a valid Title III demand was made in the first place.").

Start with the text. Title III provides that when the Attorney General makes a demand for voting-related records or papers, the federal district court where such demand is made "shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). This "appropriate process" is set forth in the Federal Rules of Civil Procedure, which, with limited exception, "govern the procedure in *all* civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1 (emphasis added). The Rules contain limited and narrow carveouts to their own application, none of which includes the claim under Title III at issue here. *See* Fed. R. Civ. P. 81. Indeed, Rule 81 affirmatively states that the Rules *do* apply in "proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute . . . ." Fed. R. Civ. P.

11

81(a)(5).

Binding precedent is in accord. The Supreme Court has held that the Federal Rules of Civil Procedure apply to summonses. *See Donaldson v. United States*, 400 U.S. 517, 528 (1971) ("The Civil Rules, of course, do have an application to a summons proceeding." (citing Fed. R. Civ. P. 81)), *superseded by statute on unrelated grounds as recognized by Polselli v. IRS*, 598 U.S. 432 (2023); *accord Becker v. United States*, 451 U.S. 1306, 1307–-08 (1981) (Rehnquist, J., in chambers) (same). Indeed, shortly after the enactment of Title III, the Court held that proceedings under the IRS's authority to compel production of records were governed by the Federal Rules and that the government bore the burden to establish the statutory requirements prior to enforcement. *See United States v. Powell*, 379 U.S. 48, 5–7-58 (1964). The IRS statute is materially identical to Title III. *Compare* 26 U.S.C. § 7604(a) ("[T]he United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data . . . .")*, with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper."). Any assertion that *Powell* does not control because of other text within the IRS statutes must fail on the basis of *Powell* itself: the Supreme Court explained that "the Federal Rules of Civil Procedure apply" expressly "[b]ecause [§] 7604(a) contains no provision specifying the procedure to be followed in invoking the court's jurisdiction." *Powell*, 379 U.S. at 58 n.18.

In its motion to compel, the United States relies primarily on out-of-Circuit cases from more than sixty years ago and does not point to any more recent caselaw supporting its position

12

on summary proceedings. *See* Mot. to Compel Br. 5–7, 13.[12] In particular, it extensively cites *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), which arose out of the specific context of the Jim Crow South and was decided prior to the Supreme Court's decision in *Powell*—which, unlike *Lynd*, is binding on this Court. *See Oregon*, 2026 WL 318402, at \*8 ("[T]he Supreme Court's holding in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*.").

The United States' reliance on *Lynd* is misplaced for multiple reasons. For one, the United States affirmatively chose to commence this matter with the filing of a Complaint. The United States thus affirmatively invoked the Rules to initiate this litigation and to defend its pleadings elsewhere, and therefore it cannot now disclaim them because the results proved unfavorable. *See Oregon*, 2026 WL 318402, at \*8 n.1 ("Even if *Lynd* applied here, the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation. By contrast, *Lynd* appears to contemplate an application directly to the court for the records.").

Nor is the information sought here at all analogous to the data requests at issue in *Lynd* and the other early cases DOJ cites. Those cases were decided before sensitive personal identifying information, such as a partial Social Security number or driver's license number, became widely collected as part of a person's voter registration record, and before the passage of landmark federal

---

[12] Even if *Lynd* and other early Fifth Circuit cases are treated as persuasive authority, they do not create the unfettered authority that the United States describes. *See In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) (acknowledging that while "[t]he right of free examination of official records is the rule" under Title III there could be "exception[s]" where "the purpose is speculative, or from idle curiosity"). *Lynd* noted that the CRA authorizes jurisdiction by "appropriate process" to compel production, 52 U.S.C. § 20705, which the court had "no doubt" would "include the power and duty to issue protective orders"—such as orders protecting and redacting sensitive information. 306 F.2d at 230.

statutes protecting such information.[13] Even then, *Lynd* explicitly noted that the records at issue were not sensitive or private. 306 F.2d at 231 ("[W]e are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection . . . .").

At bottom, *Lynd* and the United States' other Fifth Circuit cases emerged out of a radically different context. The United States acknowledges that "[c]aselaw addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, courts have not had occasion to revisit the issue." Mot. to Compel Br. at 4 n.1. But the United States studiously ignores why that is the case. *Lynd* was decided by the Jim Crow-era Fifth Circuit, consisting of Alabama, Florida, Georgia, Louisiana, Mississippi, and Texas.[14] In these states, election officials notoriously used every possible means to block Black Americans from registering to vote.[15] Congress enacted Title III to facilitate discrimination suits against recalcitrant Jim Crow counties that refused to process the voter registrations of Black voters and that stymied every effort to enforce federal law, sometimes with help from friendly judges. *Lynd*, 306 F.2d at 228 ("[Title III's] purpose is to enable the Attorney General to determine whether [52 U.S.C. § 10101 pattern-or-practice] suits or similar actions should be instituted. And it is to enable him to obtain such evidence for use in such cases if and when filed."). By the time

---

[13]    *E.g.*, Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974); Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), codified at 18 U.S.C. § 2721 *et seq.*; E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (2014), codified at 44 U.S.C. §§ 3351 *et seq.* (2014).

[14]    "Federal Judicial Circuits: Fifth Circuit," FEDERAL JUDICIAL CENTER, https://perma.cc/9MSD-EFRB (last visited Dec. 9, 2025).

[15]    *See generally*, *e.g.*, Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976).

*Lynd* was decided, the county registrar defendants had already spent eighteen months filing "a series of motions, motions to dismiss, opposing substitution motions for more definite statement and briefs and repeated extended oral arguments thereon," all "with no clear-cut ruling, no indication that this interminable proceeding would ever come to an end, and certainly never an order for production." *Id.* at 227.

It was against this backdrop of open, explicit discrimination and prolonged abuse of judicial process that the Fifth Circuit noted that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226 (internal citation omitted). In that context, "the factual foundation for" the basis and the purpose of the Attorney General's request was self-evident, and plenary consideration thus not required. *See id.* That court's treatment of the CRA more than sixty years cannot be divorced from its context. By contrast, here, more than sixty years later, the context of *this* request could not be more different. The United States has invoked the CRA for unprecedented purposes, to make sweeping demands for extensive voter data with no showing or claim of legal deficiencies or violations of rights, while making unprecedented demands for sensitive personal information.

After choosing to initiate this action by filing a Complaint in accordance with the procedures set forth in the Federal Rules, the United States attempts to get out from under the consequences. It relies on *Lynd*—which is not binding, did not concern the sensitive voter information of the type at issue here, and emerged from a radically different procedural and factual context—to insist it is entitled to summary relief without *any* review of its statutorily required stated basis and purpose. Under the Rules' plain text and binding precedent, this is not the law. "Nothing in the text of Title III requires a special statutory proceeding or any abbreviated

15

procedures." *See Weber*, 2026 WL 118807, at \*8. Because the Rules apply, the Complaint must survive scrutiny under Rule 12—which it does not.

**II.      The Complaint Fails to State a Claim Under Title III, Because It Does Not Adequately Plead That DOJ Has Provided a Written Statement of Its Basis and Its Purpose.**

Title III requires that when the Attorney General makes a demand for records under Title III, she must provide "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. The statements that DOJ offers fail to clear this bar twice over: one, they are inadequate, particularly in light of the scope of DOJ's unprecedented demand for D.C.'s full and unredacted state voter registration list, and two, they are pretextual, contradicted by a growing pile of judicially-noticeable evidence. The Complaint therefore fails to state a claim for relief.

**A.      DOJ's Statement of the Basis and the Purpose for its Requests is Inadequate.**

Title III of the CRA sets out requirements regarding federal election records: Section 301 requires officers of elections to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," with certain exceptions regarding delivery and designation of custodians. 52 U.S.C. § 20701. Section 303 requires that "[a]ny record or paper" retained and preserved under Section 301 "shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." *Id*. § 20703. "This demand shall contain a statement of *the basis and the purpose therefor*." *Id*. (emphasis added).

The "basis" and "purpose" are distinct concepts. The "basis" is an explanation of why the Attorney General believes there is a violation of federal civil rights law. *See Lynd*, 306 F.2d at 229

16

n.6; *Oregon*, 2026 WL 318402, at *9 (holding the basis prong requires "a factual basis for investigating a violation of a federal statute"); *Weber*, 2026 WL 118807, at *9 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."). The "purpose" is an explanation of how the requested records would help determine if there is a violation. *See Lynd*, 306 F.2d at 229 n.6; *Oregon*, 2026 WL 318402, at *11 ("[T]he 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights.").

DOJ's requests fail to provide "a statement of the basis and the purpose" sufficient under the statute to support disclosure of the unredacted voter file. 52 U.S.C. § 20703. Here, the Complaint offers only the allegation: "The written demand 'contain[ed] a statement of the basis and the purpose therefor.'" Dkt. 3-1 at 7 (Compl. ¶ 31) (citation omitted). Such "a formulaic recitation of the elements of a cause of action" is not "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The letters incorporated by reference into the Complaint provide little more. The July 11 Letter does not mention the CRA at all. *See* July 11 Letter. And the August 14 Letter—which is the first to mention the CRA—likewise includes only a bare allegation that the purpose is to "ascertain District of Columbia's compliance with the list maintenance requirements of the NVRA and HAVA." August 14 Letter at 3. While the July 11 Letter referenced statistics reported by D.C. in the 2024 EAVS Report, *see* July 11 Letter at 3, neither that letter nor the Complaint alleges adequate evidence of anomalies or anything inconsistent with reasonable list maintenance efforts in that reported data. This omission is fatal. *See Weber*, 2026 WL 118807, at *9–10 (detailing how

17

the United States did not meet the statutory "basis" requirement as it failed to provide any reason why it believed the state violated federal law in comparable action against California).

Even if the United States had provided a proper "basis" for its demand—and it did not—it fails to explain any connection between its purported "purpose" and the request for the full and unredacted voter file. The Complaint does not explain why unredacted voter files are necessary to determine whether D.C. has "conduct[ed] a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," Dkt. 3-1 at 4 (Compl. ¶ 16) (citing 52 U.S.C. § 20507). The NVRA and HAVA both leave the mechanisms for conducting list maintenance within a state's discretion. *See* 52 U.S.C. § 20507(a)(4), (c)(1); *id.* § 21083(a)(2)(A); *id.* § 21085.[16] The procedures carried out by a state or locality establish their compliance; the unredacted voter file does not. Even if the United States identified voters who had moved or died on D.C.'s voter list at a single point in time, that would not amount to D.C. failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this context).[17]

The basis and purpose requirement is a "critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 2026 WL 118807, at *9. The statutory

---

[16] The term "State" is defined to include the District of Columbia. *See* 52 U.S.C. § 20502(4).

[17] What is more, the inclusion at any particular point in time on D.C.'s voter registration list of some voters who may have potentially moved out of D.C. is not unusual, since Section 8(d) of the NVRA explicitly sets out a specific set of rules and requirements for removals from the voter rolls based on changes of residence, whereby the jurisdiction "shall not remove" voters on these grounds unless these voters directly confirm their change of residence in writing, or unless the jurisdiction first provides notice and then abides by a statutory waiting period until the second general federal election after providing notice. 52 U.S.C. § 20507(d).

requirement is not perfunctory; it requires a specific statement of why the information is sought and how it will aid the investigation. *See Oregon*, 2026 WL 318402, at *9 ("If *any* purpose—regardless of its relationship to the purposes of the statute itself would suffice—then the requirement of stating the demand's purpose would serve no function."). In the context of administrative subpoenas, and specifically in assessing an analogous power by which federal agencies obtain records in service of investigations, courts have found that the test of judicial enforcement of such subpoenas includes an evaluation of whether the investigation is "conducted pursuant to a legitimate purpose," *Powell*, 379 U.S. at 57, and that subpoenas issued in "bad faith" ought not to be enforced, *United States v. Aero Mayflower Transit Co., Inc.*, 831 F.2d 1142, 1145 (D.C. Cir. 1987). Such requirements ensure that the information sought is relevant and not unduly burdensome. *See, e.g.*, C*onsumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 688–89 (D.C. Cir. 2017) (reciting requirements for investigation via administrative subpoena). The CRA's basis and purpose requirement serves the same function: preventing the statute from being weaponized as a "fishing expedition" to obtain records for speculative, impermissible, or legally unauthorized reasons unrelated to the CRA's aims. *Weber*, 2026 WL 118807, at *9.

As such, even if some voting records were necessary to investigate D.C.'s NVRA list maintenance compliance, the United States has not justified demanding the *full* unredacted voter file. For decades, DOJ has neither sought nor required a full, unredacted voter file in NVRA compliance investigations. *See, e.g.*, Press Release, U.S. Dep't of Just., *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018) https://perma.cc/G2EZUUA5 (describing letters to all 44 states covered by the NVRA with requests for list maintenance information, but without demanding voter

19

files); *United States v. Kentucky*, No. 3:17-cv-00094 (E.D. Ky. June 21, 2018), Dkt. 35-1 (letter to Kentucky). The United States' failure to articulate the basis and purpose for its demand is fatal to its request.

> **B.      DOJ's Statement of the Basis and the Purpose for its Request is Pretextual.**

The government's statement is not just legally insufficient—it is also pretextual. Section 303 of the CRA requires a statement of "*the* basis and *the* purpose" of a records request. By twice using the definite article, the statute requires not just *a* basis or purpose among many, but *the* complete basis and purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and the indefinite article). But the United States has not disclosed its actual purpose, and this Court "is not obliged to accept a contrived statement and purpose" in its place. *Weber*, 2026 WL 118807, at *10. This is yet another ground for dismissal.

Public reporting and public, judicially noticeable documents confirm that the United States' *actual* purpose is not to ensure compliance with the NVRA and HAVA, but to build an unprecedented national voter file through novel, error-prone, forms of data-matching and then to use this tool to identify ostensibly ineligible voters and challenge their right to vote. *See supra* Background Sections II–III. As *Weber* characterized it, considering the same robust set of public reporting and documents, "[i]t appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." 2026 WL 118807, at *10; *accord Oregon*, 2026 WL 318402, at *11, *13.

Such a database would be unlawful on multiple grounds. Congress has never authorized a national voter database—let alone one designed to target and mass-challenge voters. Its creation alone would violate, among other provisions, the Privacy Act's prohibition on maintaining any

database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes the right to vote. *See* 5 U.S.C. § 552a(e)(7).

Consider also the MOU that the United States has recently pushed several states to sign in connection with its requests for statewide voter files. *See* MOU at 9–10. The NVRA and HAVA require states—not the federal government—to make "reasonable effort" to remove ineligible voters, 52 U.S.C. §§ 20507(a)(4), 21083(a)(4)(A), with methods of compliance "left to the discretion of the State," *id.* § 21085. The proposed MOU would violate these requirements in at least two ways. First, it purports to vest authority to identify ineligible voters in the hands of the federal government, contrary to the statute. MOU at 3, 6. Second, it would compel states to remove flagged voters "within forty-five (45) days," *id.* at 6—in violation of the NVRA's procedural protections for voters. 52 U.S.C. § 20507.

Finally, there is the Attorney General's recent letter to Minnesota Governor Tim Walz, demanding that Minnesota turn over voters' private data to help "support ICE officers" and "bring an end to the chaos" being inflicted on the civilian population there by DHS agents. *See* Bondi Letter at 2–3. By explicitly linking DOJ's request for voter data to the Administration's immigration enforcement efforts, the letter further exposes DOJ's failure to disclose the true purpose of its demands. Indeed, the federal court in *Oregon* reached the same conclusion: the context of a voter data demand within a letter about immigration enforcement "casts serious doubt as to the true purposes for which Plaintiff is seeking voter registration lists in this and other cases, and what it intends to do with that data." 2026 WL 318402, at *11.

The United States' failure to honestly disclose what it is doing—and will do—with voters' sensitive personal information is independently fatal to the CRA claim. Because the government has not stated its true purpose for demanding D.C. voters' protected personal data, it cannot invoke

the NVRA, Civil Rights Act, or HAVA as cover. Those statutes were passed to "protect voting rights," not to provide "DOJ . . . the guise of a pretextual investigative purpose." *Weber*, 2026 WL 118807, at *12. Accordingly, courts have recently observed that the presumption that the government "could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds." *Oregon*, 2026 WL 318402, at *11. The United States' "assurances that any private and sensitive data will remain private and used only for a declared and limited purpose . . . must be thoroughly scrutinized and squared with its open and public statements to the contrary." *Id.*

### III.    Nothing in Title III Entitles DOJ to Unredacted Records.

Even if disclosure were appropriate, sensitive personal voter information would still be subject to redaction. Indeed, courts have found that redaction may be required to prevent the disclosure of sensitive personal information that would create an intolerable burden on the constitutional right to vote. While DOJ states that it will comply with all relevant federal privacy protections, *see* Mot. to Compel Br. at 8, redaction is particularly appropriate in light of DOJ's admissions that federal government officials have shared sensitive Social Security information with third-parties seeking to challenge registrations and (as DOJ itself states) "overturn elections." *AFSCME* Notice at 5–6.

As discussed, Title III was enacted prior to the collection of sensitive personal information, particularly driver's license or Social Security numbers, as part of voter registration. *See supra* Argument Section I. It makes sense that caselaw from this period (which DOJ insists has great persuasive value) distinguishes the records then at issue—"public records which ought ordinarily to be open to legitimate reasonable inspection"—from "confidential, private papers and effects." *Lynd*, 306 F.2d at 231. Indeed, the public version of the voter file today is in fact "ordinarily . . . open to legitimate reasonable inspection"; it is only the uniquely sensitive fields that are not. The

information collected as part of registering to vote has changed over time, meaning courts adjudicating requests for records under Title III must now consider voters' privacy interests.

Cases interpreting Section 8(i) of the NVRA are instructive, because courts have consistently permitted—and sometimes required—redaction of voters' sensitive personal data before disclosure to protect voter privacy and ensure compliance with federal and state law. Like the CRA, the NVRA is silent as to how sensitive personal information should be treated during disclosure. *See* 52 U.S.C. §§ 20703, 20507(i)(1). As here, courts must interpret the NVRA's disclosure provisions in a manner that does not unconstitutionally burden the right to vote. *See Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 226 (D.C. Cir. 2013) (noting that the constitutional avoidance canon "emphasize[s] the importance of interpreting statutes to avoid deciding difficult constitutional questions . . . .") (quotation marks omitted).

Federal courts have consistently struck this balance, interpreting the "all records concerning" language in Section 8(i) to permit—and sometimes require—redaction and the protection of confidential materials. As the First Circuit has noted, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," and such redaction "can further assuage the potential privacy risks implicated by the public release of the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266–68 (4th Cir. 2021) (holding that the potential connection to ongoing criminal investigations and the possibility of erroneously labeling a voter as a noncitizen and subjecting them to public harassment warrants maintaining confidentiality). Other courts have consistently recognized that the NVRA does not compel the release of sensitive information otherwise protected by federal or state laws. *See, e.g.*, *N.C. State Bd. of Elections*, 996 F.3d at 264; *Pub. Int. Legal Found., Inc. v.*

23

*Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-cv-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022).

Redaction also may be affirmatively required if the disclosure would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (quotation marks and citation omitted). The Fourth Circuit, even while granting access to voter registration applications, affirmed the importance of redacting Social Security numbers, which are "uniquely sensitive and vulnerable to abuse." *Id.* The court emphasized that the NVRA reflected Congress' view that the right to vote was "fundamental," and that the unredacted release of records risked deterring citizens from registering to vote and thus created an "intolerable burden" on this fundamental right. *Id*. at 334, 339; *cf. In re Coleman*, 208 F. Supp. at 200 (noting, in the context of a Title III records request, multiple considerations which could be "[s]ignificant," including whether "official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right"). As such, public disclosure provisions such as those in the NVRA and Title III must be interpreted to avoid this unconstitutional burden. See *Long*, 682 F.3d at 339; *Bellows*, 92 F.4th at 56. The danger of imposing those burdens on D.C. voters and civic groups is present here. *See* Dkt. 12-4 at 3 (Goldman Decl. ¶¶ 5–7); Dkt. 12-5 at 2–3 (Fields Decl. ¶¶ 6–9); Dkt. 12-3 at 3, 5 (Almeida Decl. ¶¶ 7, 9, 13); Dkt. 38-1 at 3–4 (Bronstein Decl. at ¶¶ 9–11).

The same privacy and constitutional concerns warranting redactions under the NVRA apply equally to requests under the CRA. *Cf. Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 281–82

24

(2024) (Gorsuch, J., concurring) ("[O]ur Constitution deals in substance, not form. However the government chooses to act, . . . it must follow the same constitutional rules."). And the limited case law considering CRA records requests acknowledge that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, such as the redaction of sensitive fields that courts have consistently determined are entitled to protection from disclosure. *Accord Oregon*, 2026 WL 318402, at *12("[T]he vast array of cases cited above addressing the propriety of redaction in the context of the NVRA confirm that such redaction is appropriate and permissible.").

## CONCLUSION

The United States' request for D.C.'s full and unredacted electronic voter file should be denied and the complaint dismissed.

Dated: March 13, 2026

Respectfully submitted,

Sarah Brannon (D.C. Bar No. 90024493)
Adriel I. Cepeda Derieux (D.C. Bar No. 90026636)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th St. NW
Washington, DC 20001
(347) 714-1530
sbannon@aclu.org
acepedaderieux@aclu.org

*/s/ Ethan Herenstein*
Ethan Herenstein*
Sophia Lin Lakin*
Theresa Lee*
Jonathan Topaz*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
eherenstein@aclu.org
slakin@aclu.org
tlee@aclu.org
jtopaz@aclu.org

* admitted *pro hac vice*

*Counsel for Proposed Intervenors Common Cause, Ruth Goldman, and Chris Melody Fields*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served via the

Court's ECF system on all counsel of record on March 13, 2026.


                                                        */s/ Ethan Herenstein*
                                                        Ethan Herenstein