# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

UNITED STATES OF AMERICA,

    *Plaintiff*,

    v.

MONICA H. EVANS, *et al.*,

    *Defendants.*

</td><td>

Civil Action No. 25-4403 (RDM)

</td></tr>
</table>

### MEMORANDUM OPINION

During the last year, the Department of Justice ("Department") has embarked on an unprecedented effort to collect sensitive information about voters.  Since May 2025, the Department has requested the voter registration list of at least 48 states and Washington, D.C.  Dkt. 48-1 at 9.  More specifically, the Department has requested an unredacted version of each state's voter registration list complete with partial social security numbers and driver's license numbers.  *Id.*  Like many states presented with the Department's request, the District of Columbia's Board of Elections ("Board") shared its voter registration list with the Department but omitted partial social security numbers and driver's license numbers.  Dissatisfied, the Attorney General filed this suit pursuant to Title III of the Civil Rights Act of 1960 ("Title III") to compel the disclosure of that sensitive information.[1]  That is the only relief sought in this action.

---

[1] Although the captions of the complaint and motion to compel represent that the Plaintiff is the United States of America, Dkt. 1 (Compl.); Dkt. 2, the substantive averments of the complaint assert that "Plaintiff is the Attorney General of the United States," Dkt. 1 at 3 (Compl. ¶ 7).  Given that averment, and because Title III authorizes "the Attorney General or his representative" to demand access to records under Title III, 52 U.S.C. § 20703, the Court will

Because Title III does not authorize the Attorney General to compel the Board to produce its voter registration list, the Court will **DENY** his motion to compel, and because that is the only relief that he seeks, the Court will dismiss the complaint.  In light of that disposition, moreover, the Court will **DENY** Defendants' and Defendant-Intervenors' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) as moot.

## I. BACKGROUND

Although our constitutional order entrusts states with primary responsibility over the administration of state and federal elections, the Elections Clause authorizes Congress to "make or alter" regulations respecting the "times, places, and manner" of federal elections.  U.S. Const. art. I, § 4, cl. 1 (capitalization normalized); *see Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 7–9 (2013).  In addition, the Fifteenth Amendment guarantees that the right to vote "shall not be denied or abridged . . . on account of race, color, or previous condition of servitude," and it empowers Congress to enforce that guarantee.  U.S. Const. amend. XV.  These authorities laid largely dormant until the mid-twentieth century when Congress began to subject state elections and election officials to greater standardization and federal oversight.  This trend toward greater federal control over federal elections has produced several laws, three of which are at issue in this case.

The first is the Civil Rights Act of 1960, which addressed shortcomings in the Ku Klux Klan Act and the Civil Rights Act of 1957's prohibition on and penalization of race-based voter disenfranchisement.  Civil Rights Act of 1960, Pub. L. No. 86-449, 74 Stat. 86.  More than three

---

construe the complaint and motion as though they were brought in the name of the Attorney General.  Moreover, although Pam Bondi served as Attorney General when many of the relevant events occurred, pursuant to Federal Rule of Civil Procedure 25(d), the Court will construe the complaint and motion as though they were brought in the name of Todd Blanche, who currently serves as the Acting Attorney General.

decades later, Congress enacted the National Voter Registration Act ("NVRA") to address concerns that voter registration laws and procedures were depressing voter turnout.  National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 77.  In addition to "requir[ing] States to provide simplified systems for registering to vote in federal elections," *Young v. Fordice*, 520 U.S. 273, 275 (1997) (emphasis omitted), and otherwise "enhance[ing] the participation of eligible citizens as voters in elections for Federal office," 52 U.S.C. § 20501(b)(2), the NVRA requires state election officials to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant[]" or "a change . . .  [of] residence," *id.* § 20507(a)(4).  After the 2000 election placed election administration back in the spotlight, Congress followed up the NVRA with the Help America Vote Act ("HAVA").  Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666.  As relevant here, HAVA requires states to create a single, electronic statewide voter registration list maintained at the state level, 52 U.S.C. § 21083(a)(1)(A), replacing the patchwork of local lists employed by most states.  The District's HAVA-mandated electronic voter registration list, which contains the information of over 400,000 registered voters,[2] is the subject of this suit.

On July 11, 2025, the Civil Rights Division of the Department of Justice sent a letter to Defendant Monica Evans, the Executive Director of the D.C. Board of Elections, requesting on behalf of the Attorney General that Evans produce the "current electronic copy of the District of Columbia's computerized statewide registration list" with "all fields contained within the list." Dkt. 2-3 at 2.  The Department also requested specific information about the District's

---

[2] *See General Election 2024—Certified Results*, D.C. Bd. of Elections (Dec. 2, 2024), https://electionresults.dcboe.org/election_statistics/2024-General-Election, p https://perma.cc/ZBJ5-DTNC].

compliance with the National Voter Registration Act. *Id.* The Board responded to the

Department's letter on August 6, 2025. Dkt. 2-4 at 2. It provided, as requested, an electronic

copy of its computerized statewide voter registration list, *id.* at 3; a list of the election officials

responsible for implementing the District's general program of voter registration list

maintenance and a description of that program during the relevant time period, *id.* at 2–3; and

responses to each of the Attorney General's questions about the District's list maintenance

practices, *id.* at 3–6. In the copy of the voter registration list produced to the Department, the

Board omitted registrants' driver's license numbers or partial social security numbers. *See* Dkt.

1 at 6 (Compl. ¶ 24); Dkt. 41-1 at 8.

About a week later, the Civil Rights Division renewed its request for a copy of the

District's voter registration list containing "*all fields*, including the registrant's full name, date of

birth, residential address, his or her state driver's license number or the last four digits of the

registrant's social security number." Dkt. 2-5 at 2; Dkt. 1 at 6 (Compl. ¶ 25). In addition to

invoking the NVRA, the Department also cited for the first time the Help America Vote Act and

Title III of the Civil Rights Act of 1960 as sources of its authority to obtain the District's

unredacted voter registration list. Dkt. 2-5 at 2–3. It explained that "the Attorney General is

demanding an electronic copy of the District of Columbia's compete and current [voter

registration list]" for the purpose of "ascertain[ing] the [District's] compliance with the list

maintenance requirements of the NVRA and HAVA." *Id.* at 3. Addressing potential privacy

concerns, it pointed out that Title III prohibits the Attorney General and employees of the

Department from publicly disclosing the requested records and represented that "all data

received . . . will be kept securely and treated consistently with the Privacy Act," although it

explained that the Department would remain free to disclose the data to Congress and to other government agencies. *Id.*

On September 4, 2025, the D.C. Board of Elections informed the Department that it would not produce an unredacted copy of the District's voter registration list. Dkt. 2-6 at 2. It asserted that none of the statutes cited in the Department's letter—HAVA, the NVRA, or Title III—"authorize the Board to provide an unredacted [voter registration list] to the [Department]." *Id.* It then explained that the District's Freedom of Information Act authorized the withholding of the requested personally identifiable information and was not preempted by federal law. *Id.* at 3.

On December 18, 2025, the Attorney General filed suit against the District Board of Elections, Monica H. Evans, in her official capacity as Executive Director for the District of Columbia Board of Elections, Gary Thompson, in his official capacity as Chair and member of the District of Columbia Board of Elections, and Karyn Greenfield, in her official capacity as member of the District of Columbia Board of Elections. *See* Dkt. 1 (Compl.). He alleges that the Board's "refusal to provide the election records" requested by the Attorney General "violates Title III of the Civil Rights Act." *Id.* at 7 (Compl. ¶ 32). The complaint did not invoke any other authority to support its request. On the same day the Attorney General filed his complaint, he also moved to compel the Board to produce the District's voter registration list with all fields unredacted. *See* Dkt. 2.

Before the Board was served, the Maryland/DC Alliance for Retired Americans, Common Cause, and two individuals moved to intervene as defendants. *See* Dkt. 9; Dkt. 12. Neither the Attorney General nor the District opposed either motion. *See* Dkt. 11; Dkt. 19; Min. Order (Mar. 16, 2026). After holding a motions hearing to address whether the proposed

intervenors have Article III standing, Min. Entry (Feb. 5, 2016), and receiving supplemental briefing on that subject, *see* Dkt. 38, Dkt. 39, the Court granted both motions to intervene, *see* Min. Order (Mar. 16, 2026).  On March 13, 2026, the District and Defendant-Intervenors ("Defendants") filed motions to dismiss the complaint and oppositions to the motion to compel. *See* Dkt. 41; Dkt. 58; Dkt. 59.  The Attorney General's motion to compel and the District's and Defendant-Intervenors' motions to dismiss are now fully briefed, *see* Dkt. 54, Dkt. 55, Dkt. 56, Dkt. 57, Dkt. 62, Dkt. 63, and ripe for decision.

## II. LEGAL STANDARD

The Court begins by determining the standard that applies to the Attorney General's motion to compel.  In this suit, the Attorney General relies solely on Title III for his entitlement to the District's voter registration list.  Title III requires state election officers to "retain and preserve" for a specified period of time "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting."  52 U.S.C. § 20701.  It further authorizes the Attorney General to demand "[a]ny record or paper required . . . to be retained and preserved" for "inspection, reproduction, and copying."  *Id.* § 20703.  If a state election official refuses to produce the requested records, Section 20705 gives the Attorney General an enforcement mechanism.  It provides:

> The United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction by *appropriate process* to compel the production of such record or paper.

*Id.* § 20705 (emphasis added).

Section 20705 does not specify what constitutes "appropriate process" or the legal standard to be applied to the government's motion to compel.  Relying on Fifth Circuit precedent enforcing Title III record requests during the early 1960s, the Department describes a Title III

enforcement suit as a "special statutory proceeding," unburdened by the strictures of the Federal Rules of Civil Procedure.  Dkt. 2-1 at 13 (quoting *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)).  The Department maintains that to obtain an order compelling the D.C. Board of Elections to produce the unredacted D.C. voter registration list, it need only file a "simple statement" describing its written demand and stating that the election official to which its demand was directed failed to comply.  *Id.* at 13–14.  The Board disagrees.  It contends that the Department's requests for a "summary" proceeding and for an order to compel constitute "an improper attempt to circumvent the Court's determination of the merits, in the ordinary course and through established means."  Dkt. 41-1 at 16.  The Board would have the Court apply the ordinary standard for a motion to dismiss under Rule 12(b)(6) or, at least, exercise its authority to "ensure its process is not being abused."  *Id.* at 17–22.

Contrary to the Department's suggestion, Title III does not completely "displace[] the Federal Rules of Civil Procedure."  Dkt. 2-1 at 13.  Title III records requests are a species of administrative subpoena.  *See Subpoena*, Black's Law Dictionary (12th ed. 2024) (defining an administrative subpoena as "[a] subpoena issued by an administrative agency to compel an individual to provide information to the agency"); *cf. United States v. Markwood*, 48 F.3d 969, 975–76 (6th Cir. 1995) (characterizing a false claims civil investigative demand as an administrative subpoena because it is "at its essence, a subpoena issued by an administrative agency").  As Rule 81 makes clear, the Rules "apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute."  Fed. R. Civ. P. 81(a)(5).

Consistent with Rule 81, the Supreme Court has long held that the Federal Rules of Civil Procedure apply to enforcement proceedings for administrative subpoenas.  Shortly after the

7

passage of Title III, the Court interpreted another statutory provision authorizing district courts to enforce IRS summonses "by appropriate process" to incorporate the Federal Rules of Civil Procedure. *United States v. Powell*, 379 U.S. 48, 52, 58 n.18 (1964). In subsequent cases, the Court has reaffirmed that the Rules apply to administrative subpoena enforcement proceedings, *see, e.g.*, *Donaldson v. United States*, 400 U.S. 517, 528 (1971), and, moreover, that "appropriate process" "is not *ex parte* but adversarial," *United States v. Clarke*, 573 U.S. 248, 253 (2014). The Court must ensure that "the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Donaldson*, 400 U.S. at 529.

Although the government is not entitled to a judicial order rubber stamping its records request, the Court's role in a subpoena enforcement proceeding is limited. Administrative subpoena enforcement proceedings are "summary in nature" because their purpose is to facilitate the agency's investigative authority, not to establish the subpoenaed party's legal liability. *Clarke*, 573 U.S. at 254 (citation modified); *see Donaldson*, 400 U.S. at 528–29 (court may limit application of the Rules in a summary enforcement proceeding). The Court must therefore enforce an administrative subpoena if "the inquiry is within the authority of the agency, the demand is not too indefinite[,] and the information sought is reasonably relevant." *In re Sealed Case (Administrative Subpoena)*, 42 F.3d 1412, 1415 (D.C. Cir. 1994) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)). Courts "defer to the agency's appraisal of relevancy," so long as "it is not obviously wrong." *Resolution Trust Corp. v. Walde*, 18 F.3d 943, 946 (D.C. Cir. 1994) (citation modified).

The Court may, however, inquire into the good or bad faith of an agency in issuing an administrative subpoena if the recipient "makes an adequate showing that the agency is acting in bad faith or for an improper purpose, such as harassment." *Resolution Trust Corp. v. Frates*, 61

F.3d 962, 965 (D.C. Cir. 1995) (citation modified).  To justify an evidentiary hearing on the issue

of bad faith, a subpoena recipient "need only make a showing of facts that give rise to a plausible

inference of improper motive." *Clarke*, 573 U.S. at 254.  While "[n]aked allegations of improper

purpose" will not do, "neither is a fleshed out case demanded." *Id.*  Circumstantial evidence of

bad faith is sufficient to justify giving the recipient of an administrative subpoena an opportunity

to examine the agency decision-maker about his motive for issuing the subpoena. *Id.*

With these standards for assessing the government's motion to compel in mind, the Court

turns to the validity of the government's records request. [3]

### III. ANALYSIS

The District raises several defenses to the government's request for its unredacted voter

registration list.  It first argues that the government's records request failed to comply with the

requirements of Title III because (1) it did not provide the "basis" for its demand; (2) its stated

purpose does not require the District's unredacted list; and (3) the District's list is not a record

covered by Title III.  Dkt. 41-1 at 23–27.  Failing that, the District argues that the government's

request for its unredacted list violates federal privacy laws and the District's privacy laws. *Id.* at

---

[3] Because the Court must apply the well-established standards for enforcement of an administrative subpoena to the Attorney General's motion to compel and because the purpose of an administrative subpoena is not to establish the summoned party's liability, framing the question presented in terms of the adequacy of the Attorney General's complaint is inapt; indeed, proceedings to enforce subpoenas and similar forms of process are often brought as miscellaneous matters, without requiring the agency to file a complaint. *Cf.* Fed. R. Civ. P. 45(d)(3) (authorizing subpoenaed parties to move to quash a subpoena under certain circumstances).  Here, the complaint merely served to initiate the matter and to provide a springboard for the Attorney General's motion to compel.  The Board, as the summoned party, is entitled to oppose the Attorney General's motion to compel, and the Department did not object to the participation of the intervenors in this proceeding.  The Court will therefore consider all of Defendants' and Defendant-Intervenors' arguments in opposition to the motion to compel under the proper standard.  In addressing the motion to compel, moreover, the Court will necessarily resolve the Attorney General's sole request for relief, which will, in turn, require dismissal of the action and which will moot the pending motions to dismiss under Rule 12(b)(6).

28–32.  Finally, the District contends that the government's stated purpose for seeking the unredacted list may be pretextual and that they are entitled to an adversarial hearing to assess its motivation.  *Id.* at 33.

Jurisdictions across the country have raised similar arguments to resist materially identical requests from the Attorney General to produce their unredacted voter registration lists. So far, the Attorney General has filed at least 30 suits to compel the production of a state's voter registration list.  *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. (Aug. 4, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information [https://perma.cc/KWP6-KTP4]; *see also* Dkt. 49-1 at 28.  At this time, twenty district courts and the Sixth Circuit have denied the government's motion to compel on various grounds, leaving the Court with no shortage of guidance on these issues.[4]  After careful

---

[4] *See United States v. Griswold*, No. 25-cv-3967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026); *United States v. Matthews*, No. 25-cv-3398, --- F. Supp. 3d ---, 2026 WL 2212877 (C.D. Ill. July 31, 2026); *United States v. Caldwell*, No. 26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026); *United States v. Adams*, No. 3:26-cv-19, --- F. Supp. 3d ---, 2026 WL 2123871 (E.D. Ky. July 23, 2026); *United States v. Thomas*, No. 3:26-cv-21, 2026 WL 2070437 (D. Conn. July 17, 2026); *United States v. Koski*, No. 3:26-cv-42, 2026 WL 2032532 (E.D. Va. July 14, 2026); *United States v. Oliver*, No. 1:25-cv-1193, 2026 WL 2031479 (D.N.M. July 14, 2026); *United States v. Warner*, No. 2:26-cv-156, 2026 WL 2018877, --- F. Supp. 3d --- (S.D.W. Va. July 13, 2026); *United States v. Bd. of Elections*, No. 25-cv-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. Scanlan*, No. 25-cv-371, --- F. Supp. 3d ---, 2026 WL 1864054 (D.N.H. June 29, 2026); *United States v. Schmidt*, No. 2:25-cv-1481, --- F. Supp. 3d ---, 2026 WL 1850016 (W.D. Pa. June 27, 2026); *United States v. DeMarinis*, No. 1:25-cv-3934, 2026 WL 1780586 (D. Md. June 18, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026), *aff'd* 179 F.4th 470 (6th Cir. 2026); *United States v. Fontes*, No. 26-cv-66, --- F. Supp. 3d ---, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Galvin*, No. 25-cv-13816, --- F. Supp.3d ---, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, No. 25-cv-639, --- F. Supp. 3d ---, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Bellows*, No. 25-cv-468, --- F. Supp. 3d ---, 2026 WL 1430579 (D. Me. May 21, 2026); *United States v. Wis. Elections Comm'n*, No. 25-cv-1036, --- F. Supp. 3d ---,

consideration, the Court agrees with the fifteen courts that have held that Title III does not authorize the Attorney General to compel state election officials to produce unredacted copies of their states' voter registration lists.  *See United States v. Griswold*, No. 25-cv-3967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026); *United States v. Matthews*, No. 25-cv-3398, --- F. Supp. 3d ---, 2026 WL 2212877 (C.D. Ill. July 31, 2026); *United States v. Caldwell*, No. 26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026); *United States v. Adams*, No. 3:26-cv-19, --- F. Supp. 3d ---, 2026 WL 2123871 (E.D. Ky. July 23, 2026); *United States v. Thomas*, No. 3:26-cv-21, 2026 WL 2070427 (D. Conn. July 17, 2026); *United States v. Koski*, No. 3:26-cv-42, 2026 WL 2032532 (E.D. Va. July 14, 2026); *United States v. Bd. of Elections*, No. 25-cv-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. Scanlan*, No. 25-cv-371, --- F. Supp. 3d ---,  2026 WL 1864054 (D.N.H. June 29, 2026); *United States v. DeMarinis*, No. 1:25-cv-3934, 2026 WL 1780586 (D. Md. June 18, 2026); *United States v. Schmidt*, No. 2:25-cv-1481, --- F. Supp. 3d ---, 2026 WL 1850016 (W.D. Pa. June 27, 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026), *aff'd* 179 F.4th 470 (6th Cir. 2026); *United States v. Fontes*, No. 26-cv-66, --- F. Supp. 3d ---, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Bellows*, No. 25-cv-468, --- F. Supp. 3d ---, 2026 WL 1430579 (D. Me. May 21, 2026); *United States v. Wis. Elections Comm'n*, No. 25-cv-1036, --- F. Supp. 3d ---, 2026 WL 1430354 (W.D. Wis. May 21, 2026).  As those courts have persuasively explained, the language, context, and purpose of Title III all confirm that Title III authorizes the Attorney General to obtain records that come into state election officials' possession, not records created by those officials.

---

2026 WL 1430354 (W.D. Wis. May 21, 2026).  Although the Department of Justice's Office of Legal Counsel has indicated that it has "continued to monitor the evolving litigation landscape" to meet its "ongoing obligation to provide [its] best view of the law to the Executive Branch," Dkt. 65-1 at 10 n.12, it does not appear that this overwhelming weight of authority has swayed the Department's views.

The Court begins with the text of 52 U.S.C. § 20703, which sets out the Attorney General's authority to request certain records from state election officials. Section 20703 provides in full:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

52 U.S.C. § 20703. The first sentence of Section 20703 specifies the universe of records that the Attorney General is entitled to demand: "[a]ny record or paper required by section 20701 of this title to be retained and preserved." *Id.* Section 20701, in turn, provides:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . .

*Id.* § 20701.

The key language in Section 20701 is as follows: "all records and papers which *come into his possession*." *Id.* (emphasis added). As explained in Chief Judge Jarbou's well-reasoned opinion, that language refers "to only those documents that state election officials receive from prospective voters," not documents that election officials themselves create, including voter registration lists. *Benson*, 819 F. Supp. 3d at 768. The phrase "come into his possession" employs an active verb, referring to the "process by which someone *acquires* an item from an external source." *Id.* (collecting authorities). It captures "the act of taking, receiving, etc., rather than the resulting state of possession." *Have (v.), sense II.10.a*, Oxford Eng. Dictionary (Mar.

12

2026), https://doi.org/10.1093/OED/5708225681 [https://perma.cc/JVU3-FM45] (where "have" means "[t]o come into possession of," it has a "range of active synonyms," including "to be the recipient of; to get, obtain; to receive, take"). As a matter of common usage, one might say, for example, that the Mona Lisa "came into the possession" of the Louvre around 1797; one would not say that the painting "came into the possession" of Leonardo da Vinci when he completed it around 1517. Consistent with the ordinary meaning of "come into possession," many federal statutes use that phrase to refer to "items that a person *obtains* rather than *creates*." *Benson*, 819 F. Supp. 3d at 768 (collecting federal statutes).

Notably, the Department does not dispute that, as matter of ordinary usage, one "comes into possession" of a record or other item when "he 'get[s]' or 'acquire[s]' it and retains it within his control." Dkt. 54 at 27 (alterations in original) (quoting *Webster's New World Dictionary* 291 (8th coll. ed. 1960)). That is, of course, correct. But the Department, then, incorrectly argues that the words "acquire" and "create" mean the same thing—or at least that the word "acquire" is capacious enough to include records and other items that the agency itself "creates." When the word "acquire" is used in conjunction with tangible items, like "records and papers," as opposed to skills or traits like better study habits or a reputation for honestly, it connotes an action by which the object is obtained from another. *See Acquire*, Collins Dictionary, https://www.collinsdictionary.com/dictionary/english/acquire [https://perma.cc/9SPG-3WVZ] ("If you acquire something, you buy or obtain it for yourself, or someone gives it to you," but "[i]f you acquire . . . a skill or a habit, you learn it, or develop it through your daily life or experience"). The notion of action—or transfer—is even more evident in the text at issue, which refers to "records and papers which come into his possession." 52 U.S.C. § 20701. The word "come" means "to move toward," "reach," "arrive," or "approach." *Come*, Merriam-

13

Webster Dictionary (Aug. 3, 2026), https://www.merriam-webster.com/dictionary/come [https://perma.cc/DV74-N279].  As used in context, then, "come into his possession" refers to a record or paper that reached or arrived in the possession of the Board, and not a record or paper that originated there.

The Department resists this natural reading of the phrase and argues that "Congress used the phrase '*come* into his possession' rather than '*are* in his possession . . . to focus on *how* and *when* the officer gains possession of the records or documents in the first instance." Dkt. 54 at 27.  But the fact that Congress often uses "come into possession" with other words specifying when or the manner in which something is acquired tells us nothing about the ordinary meaning of "come into possession."  A person can "come into possession" of a record created by a third party "through improper means" or "at a particular time" or through unspecified means at an unknown time.  The time at which or the character of the source from which a record is acquired are additional pieces of information that Congress might use to trigger a particular duty or to identify an item.  They do not define the phrase "come into possession."

"Following this focus on the *when* and *how* an individual gains possession of a record or paper," the Department continues, the statute "places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision." *Id.* at 28 (emphasis in original).  The problem with this argument—or, more accurately, one of many problems with it—is that the phrase "records and papers which come into his possession" says nothing about when or how the Board acquires the records and papers.  It certainly does not suggest that the *how* includes records and papers that did not "come" to the Board but, rather, originated with the Board.  Nor does the Department offer any coherent response to the question that it itself poses—that is, if Congress intended what

14

the Department now maintains, why didn't it simply refer to all records and papers that "*are* in [the Board's] possession"?[5]

To the extent there is any ambiguity in the language of Section 20701, it is resolved by Section 20702.  That section imposes penalties on "[a]ny person . . . who willfully steals, destroys, conceals, mutilates, or *alters* any record or paper required by section 20701 of this title to be retained and preserved."  52 U.S.C. § 20702 (emphasis added).  As Judge Brnovich of the U.S. District Court for the District of Arizona has observed, if voter registration lists were covered by Section 20703, then Section 20702 would penalize state election officials for altering those lists.  *Fontes*, 2026 WL 1177244, at *4.  That would defeat the purpose of voter registration lists, which is to maintain an accurate and up-to-date record of all individuals qualified to vote in a particular jurisdiction.  Consistent with that purpose, state election officials add and remove people, update outdated information, and correct clerical errors on an ongoing basis.  Reading Title III in the manner that the Department proposes would subject state election officials to liability for taking the steps necessary to maintain an accurate voter registration list— and, indeed, from altering their calendars, draft memos, and other fluid records without preserving each intermediate version.  And, paradoxically, it would subject officials to liability for taking the steps mandated by the NVRA and HAVA—the very statutes the government has asserted an interest in enforcing.  Nothing in the text of Title III compels this strange and unharmonious reading of federal election law.  *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 525 (2018).

---

[5] Sensibly, the Department does not argue that Title III applies to the voter registration lists because they contain *information* obtained from voters and potential voters.  As explained in *Benson*, Title III "is not designed to facilitate the disclosure of voter information" but, instead, "requires the disclosure of *documents*, such as the voter applications that a state might be improperly discarding."  819 F. Supp. 3d at 769.

The Department's remaining arguments based on Title III's text are unpersuasive.  It posits, for example, that the phrase "relating to" expands the scope of Title III to records created by state election officials.  Dkt. 54 at 25–26.  The Department is, of course, correct that the phrase "relating to" often has a broadening effect.  But it errs in suggesting that the phrase can broaden Section 20701 beyond the provision's outer boundaries, as established by the phrase "come into his possession."  The "relating to" clause modifies and limits the phrase that precedes it.  The preservation requirement does not apply to "all records and papers which come into [the Board's] possession."  It applies only to the subset of those "records and papers" acquired by the Board that "relat[es] to [an] application, registration, payment of poll tax, or other act requisite to voting."  By reading "relating to" in a manner that swallows and nullifies "come into his possession," the Department's interpretation ignores the plain meaning of the statute and violates the "fundamental rule of statutory interpretation . . . that in construing statutes," we "should give effect, if possible, to every word used by Congress."  *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 688 (D.C. Cir. 2023) (citation modified).  Had Congress intended to require the production of all documents "relating to" registration in the possession of state election officials, it "could have referred simply to 'records in the possession of' election officials, or even just 'records' without any qualifier, which is the language used in the NVRA."  *Benson*, 819 F. Supp. 3d at 768; *cf.* 52 U.S.C. § 20507(i)(1) (requiring states to "make available for public inspection . . . all records concerning the implementation of [certain programs and activities]").[6]

---

[6] The government also cites some out-of-circuit district court cases describing the records covered by Section 20701 in broader terms.  Dkt. 54 at 24, 26.  Because the scope of Section 20701 was not at issue in any of those cases, their sweeping descriptions of the records covered by Title III are, at best, dicta and unpersuasive.  *See, e.g., State of Ala. ex rel. Gallion v. Rogers*,

Having run out of arguments based on the text of Section 20701, the Department suggests that a ruling in the Board's favor would "create absurd results" and "undermine the statute's purpose." Dkt. 54 at 26, 29. It contends that limiting the scope of Section 20701 to documents acquired by election officials would make it "nearly impossible" for the government to "ascertain whether a jurisdiction engages in practices that violate federal law." *Id.* at 29. But nothing supports the Department's supposition that Congress intended Title III to be a freewheeling source of authority for the Attorney General to investigate any violation of federal election law.

Title III predates the NVRA and HAVA by more than three decades and was not drafted with the issue of list maintenance in mind. By 1960, Congress had its sights set on the maze of voter registration requirements employed by southern states to disenfranchise their black residents. Southern states employed an array of facially colorblind registration requirements—including poll taxes, literacy tests and general knowledge examinations, witness requirements, residency or property ownership requirements, and lineage-based rules—to prevent black residents from voting. *See generally* U.S. Comm'n on Civil Rights, *Report of the United States Commission on Civil Rights* (1959) ("1959 Civil Rights Report"); Marcia L. Fudge, 116th Cong., Voting Rights and Election Administration in the United States of America 11–30 (2019). State election officers carried out regimes of disenfranchisement by meeting at irregular hours, requiring black applicants to wait in lengthy lines, or failing to convene at all. *See, e.g.*, 1959 Civil Rights Report at 90–95. They also used their considerable discretion in evaluating registration applications to reject black applicants for minor errors or unsatisfactory answers akin

---

187 F. Supp. 848, 855 (M.D. Ala. 1960); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985).

17

to those white applicants also made or were permitted to correct. *See, e.g.*, *id.* at 59, 61–67, 76, 87–93, 104.

Although the Civil Rights Act of 1957 had "authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds," *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966), litigation had proven unsuccessful at registering black voters. 1959 Civil Rights Report at 128–33. The Attorney General's ability to secure injunctive relief was thwarted by, among other obstacles, his inability to effectively investigate and gather evidence of discriminatory denials of the right to vote. *Proposals to Secure, Protect, and Strengthen Civil Rights of Persons Under the Constitution and Laws of the United States: Hearing Before the Subcomm. on Const. Rts. of the S. Comm. on the Judiciary*, 86 Cong. 185–92 (1959) (statement of William P. Rogers, Att'y Gen. of the U.S.) ("1959 Hearings"); Dwight D. Eisenhower, *Message from the President of the United States Transmitting Recommendations Pertaining to Civil Rights*, H.R. Doc. No. 86-75, at 2 (1959); 1959 Civil Rights Report at 133, 149. Attorney General William Rogers explained the problem as follows:

> To establish a denial or threatened denial of the right to vote because of racial discrimination requires proof not only that qualified persons are not permitted to register or vote, but that the denial is based on racial discrimination. This calls for evidence that individuals of a particular race had in fact either satisfactorily demonstrated their qualifications and had offered to do so, and were nevertheless not allowed to register or vote, while individuals of another race no better qualified had been permitted to register or vote.
>
> . . . . The only source of such *comparative information*—necessary for proper evaluation of complaints and in the preparation of cases—is the *records of registrations or other action required for exercise of the franchise.*

18

1959 Hearings, 86 Cong. 191 (statement of William P. Rogers, Att'y Gen. of the U.S.) (emphasis added).[7]

In short, the Eisenhower Administration proposed the legislation to permit the Department of Justice to examine and to compare minority and non-minority "records of registrations or other action required for exercise of the franchise," so that it could determine whether those materials reflected disparate treatment. *Id.* And the legislation was necessary because states that were resistant to providing black voters with the franchise responded to the Civil Rights Act of 1957 by authorizing local officials to destroy "the questionnaires of unsuccessful applicants for registration" or to engage in "[s]imilar" "obstruct[ive]" actions. *Id.* at 192. Without access to accepted and rejected registration materials, the Attorney General could not independently evaluate whether black voters had satisfactorily established their qualifications or had done all that was asked of white voters, such that their omission from the voter rolls could be attributed to race. *See An Act to Enforce Constitutional Rights, and for Other Purposes: Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86 Cong. 9 (1960) (statement of William P. Rogers, Att'y Gen of the U.S.; accompanied by Lawrence E. Walsh, Deputy Att'y Gen. of the U.S.) ("1960 Hearings") ("In many cases, discrimination in registration can be proved only by comparing the records of Negro applicants with those of white applicants.")

The Civil Rights Commission, which had been created in 1957 to investigate equal protection violations, examined the problem in detail in its 1959 report to Congress. In Alabama and Louisiana, which "led in the number of voting complaints received by the Commission,"

---

[7] Notably, this language—"records of registrations or other action required for exercise of the franchise"—closely tracks the language Congress enacted—"records . . . relating to any . . . registration . . . or other act requisite to voting," 52 U.S.C. § 20701.

numerous obstacles impeded efforts to examine voting records.  1959 Civil Rights Report at 137.

Election officials in Louisiana cited a Louisiana statute that permitted the examination of voting

records "only by a registered voter of the parish, and permit[ted] copying of the records only on

petition of 25 registered voters."  *Id.* at 98–99; *see also id.* at 137.  In Alabama, election officials

interpreted provisions of Alabama's constitution and state law as precluding "examination" of

the records "by a nonjudicial body of the Federal Government."  *Id.* at 137.  After Alabama

election officials compromised and allowed the Civil Rights Commission to inspect some (but

not all) of the voting records the Commission sought, the state legislature passed a statute

authorizing "the destruction of application forms of persons denied registration."  *Id.*  It was

these forms that the Civil Rights Commission and the Attorney General deemed "essential to any

investigation of denials of the right to vote."  *Id.*; *see* 1960 Hearings, 86 Stat. 9 (statement of

William Rogers, Att'y Gen. of the U.S.).  Notably, the Alabama law authorizing the destruction

of rejected registration materials was repeatedly cited as the mischief that Title III was enacted to

address.  1960 Hearings, 86 Stat. 9 (statement of William Rogers, Att'y Gen. of the U.S.); 1959

Hearings, 86 Stat. 192 (statement of William Rogers, Att'y Gen. of the U.S.); 1959 Civil Rights

Report at 153.

In light of this history, the Department's characterization of Title III's distinction

between voter registration records and voter registration lists as "pedantic," Dkt. 54 at 25, 27,

falls flat.[8]  Title III was the Department of Justice's answer to two years of resistance and

---

[8] In contrast, the Department resorts to just the kind of "pedant[ry]" that Congress could not possibly have intended when it posits that even if "come into possession" excludes self-generated records and papers, it would not matter because Sections 20701 and 20703 "focus on individual 'officer[s] of election' and 'person[s].'"  Dkt. 54 at 29.  On this theory, even if one election officer generated the requested record and "therefore did not 'come into . . . possession' thereof, any other 'officer of election' within the same agency that acquires the record has indeed

obstruction by state election officials who destroyed, failed to retain, or simply refused to

disclose the voting records—especially registration applications and questionnaires—that would

prove that black voters were victims of disparate treatment and had been unlawfully excluded

from the rolls based on nothing more than their race.[9] A list of all the voters registered to vote in

a jurisdiction, by contrast, would not have enabled the Attorney General to conduct the sort of

comparative analysis necessary to seek injunctive relief. *See Benson*, 819 F. Supp. 3d at 769.

And, in any event, voter rolls have long been treated as public records, which are made available

to political parties, advocacy organizations, and members of the public.[10] *See, e.g.*, Joseph P.

Harris, Registration of Voters in the United States, Inst. for Gov't Rsch. 44, 167, 179, 236, 259,

270, 272, 290 (1929), https://babel.hathitrust.org/cgi/pt?id=uc1.$b22360&seq=26&q1=list.  In

the years leading up to the passage of Title III, the Civil Rights Commission was able to obtain

---

'come into . . . possession' of the record." *Id.*  The government cannot plausibly suggest that Congress intended the availability of state voter registration lists to turn on the staffing practices of state election bodies.  Indeed, on the Department's reading, Section 20701's preservation requirement would extend separately to each and every "officer of election," requiring officials to retain multiple copies of the same records and papers, on pain of fine or imprisonment.

[9] At one point, the Department posits that limiting Title III to records received by election officials would effectively carve out electronically submitted voter registration applications. Dkt. 54 at 25.  But it has not offered a single reason why such applications—the quintessential example of a "record or document" covered by Section 20701—would be beyond the reach of the Attorney General under appropriate circumstances.  Election officials acquire all completed voter registration applications, whether they are submitted online or mailed in.

[10] The District of Columbia makes the version of its voter registration database that it produced to the Department of Justice available to any member of the public who asks.  D.C. Mun. Regs. tit. 3, § 510.3–.4 (2026).  Although today's voter registration lists contain more sensitive information than their 1960s counterparts, the vast majority of states still permit public inspection of properly redacted voter registration lists or make the lists available to specific people and entities.  *See Access to and Use of Voter Registration Lists*, Nat'l Conference of State Legislatures (June 10, 2026), https://www.ncsl.org/elections-and-campaigns/access-to-and-use-of-voter-registration-lists#Body [https://perma.cc/ET8K-QNT4] (summarizing the public availability of voter registration lists in each state).

lists of qualified voters, even in jurisdictions hostile to its mission. *See, e.g.*, 1959 Civil Rights Report at 75, 81–82, 148.

For these reasons, the omission of voter registration lists from Title III neither renders the statute absurd nor undermines its purpose. Of note, when Congress did address voter registration list maintenance in the NVRA and HAVA, it did not give the Attorney General administrative subpoena authority to investigate violations of those statutes. *See Benson*, 819 F. Supp. 3d at 759–60; *Bellows*, 2026 WL 1430481, at *8–9. The NVRA contains only a public disclosure provision authorizing the Department and the public alike to procure certain registration records, *see* 52 U.S.C. § 20507(i), and HAVA does not contain any disclosure provision at all. Given the conspicuous absence of any provision in the NVRA or HAVA giving the Attorney General special access to state voter registration lists, it is difficult to discern the basis for the Department's assertion that "Congress plainly intended that [the Department of Justice] be able to conduct an independent review of each state's list," Dkt. 2-5 at 4; *see also* Dkt. 47-1 at 26 (explaining that the Department does not usually "request[] or receive[] sensitive information like SSNs and driver's license numbers" under Title III). If the Department disagrees with Congress's judgment as to the records necessary to carry out its enforcement duties under either HAVA or the NVRA, it needs to lodge that objection with Congress.

\*   \*   \*

For the foregoing reasons, the Court concludes that Title III's retention and preservation obligation does not cover voter registration lists. As such, the Attorney General may not invoke Title III to compel the Board to produce an unredacted version of its voter registration database, and the Court will, accordingly, deny the Department's motion to compel, Dkt. 2. Moreover, because the scope of Title III fully disposes of the Department's motion to compel and its

complaint, the Court need not address the other issues raised by Defendants and Defendant-Intervenors.  The Court's conclusion also disposes, more generally, of the remainder of the case. As explained, the Department is not entitled to the only relief that it seeks in its complaint, Dkt. 1 (Compl.), and the Court will, therefore, dismiss the complaint, which merely formed the springboard for the Department's motion to compel, *see infra* n.3.  Finally, because the Court will dismiss the complaint, it can also deny Defendants' and Defendant-Intervenors' motions to dismiss, Dkt. 41, Dkt. 58, Dkt. 59, as moot.

### CONCLUSION

For the foregoing reasons, the Court will **DENY** Plaintiff's motion to compel, Dkt. 2, and **DISMISS** Plaintiff's complaint.  The Court will also **DENY** as moot Defendants' and Defendant-Intervenors' motions to dismiss, Dkts. 41, 58, 59.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  August 6, 2026

23